## MacARTHUR MINING CO., Inc. v. RECON-STRUCTION FINANCE CORPO-RATION.

### No. 4985.

United States District Court
W. D. Missouri, W. D.

Feb. 25, 1949.

Hook & Thomas and John W. Hoffman, Jr., all of Kansas City, Mo., for plaintiff.

Sam M. Wear, U. S. Atty. and Earl A. Grimes, Sp. Asst. to U. S. Atty., both of Kansas City, Mo., H. G. Morison, Asst. to Atty. Gen., Joseph M. Friedman, Sp. Asst. to Atty. Gen., and George Arthur Fruit, Attorney, Department of Justice, of Washington, D. C., for defendant.

REEVES, Chief Judge.

In its motion to dismiss the defendant challenges the jurisdiction of the court. It is suggested in the argument that the remedy, if any, in favor of the plaintiff, may be found in the Emergency Court of Appeals created pursuant to the Emergency Price Control Act, 50 U.S.C.A. Appendix, § 901 et seq. For a proper understanding of the nature of the proceeding a brief statement of facts should be made.

The plaintiff was engaged in mining operations in the years 1942 and 1943 as well as in subsequent years. During that period the Government was in great need of strategic and critical materials, such as lead and zinc, and the plaintiff was then engaged in mining such strategic and critical materials. Because of the great need of these metals the Government formally announced a policy, through the President, of encouraging the mining of such materials, and especially in marginal or ordinarily and usually non-paying mines. To make sure that an adequate supply of those essential materials might be obtained, it became and was an announced and fixed policy of the Government to pay such subsidies, that is to say, to assure such mining operators that they should have such a subsidy or subsidies as would guarantee a fair margin of profit. The arrangement for such a subsidy or subsidies, or premium, was fixed by a Premium Price Plan Quota Committee operating under and in connection with a corporation specially organized for the purpose and known as Metals Reserve Company, being a subsidiary of the defendant.

This company was organized as a subsidiary of the defendant, and, when dissolved, its liabilities were assumed through statutory authorization by the defendant.

On January 1, 1943 there was in existence an Executive Order fixing or freezing the price of zinc at 8¼ cents per pound and the price of lead at 6½ cents per pound. At the same time there was a Premium Price Plan Quota Committee made up of one representative of the Office of Price Administration, one representative of the War Production Board, and one representative of the Metals Reserve Company, the defendant's subsidiary. This committee undertook to determine, under the policy and authorization of the Government, an appropriate subsidy for the plaintiff in its operations carried on in the tri-state district of Missouri, Oklahoma, and Kansas. The committee fixed a subsidy for the twenty-three months' period, January 1, 1943 to December 1, 1944. This subsidy was objectionable to the plaintiff as insufficient "to provide for a fair margin of profit to which petitioner was entitled as a matter of right and as a matter of law as provided in the Directive of the President of the United States."

The plaintiff continued its operations, however, upon the assurances contained in a Presidential Directive that it would be paid a subsidy which would give it "a fair margin of profit." It is averred in the complaint that at no time was there an agreement that the quota fixed was adequate, but that, on the contrary, at all times the plaintiff protested its inadequacy and at all times relied upon the commitment of the Government that a fair margin of profit would be allowed. The plaintiff says that it lost "approximately nineteen cents (19¢) per ton of rock mined during the period January, 1943 to December, 1944," and that its total loss aggregated $165,621.17, and for this sum it asks judgment against the defendant, which, as stated, assumed the liabilities of Metal Reserves Company.

By Count II of its complaint the petitioner avers that during the months of October and November of 1946 the price of zinc advanced from 8¼ cents to 10½ cents per pound, and that, because of this advance, the Quota Committee "arbitrarily and contrary to law deducted from the quota of your Petitioner, and others having similar quotas, the sum of ten and 30/100 Dollars ($10.30) per ton on each ton of concentrates produced."

Again the plaintiff protested and claimed, and now claims, that it suffered a loss in the sum of $45,899.09, for which it asks judgment against the defendant on its second count.

It is the contention of the defendant that this is an action in fact against the United States and that the United States has not consented to be sued. Moreover, it contends that the petitioner or claimant has not exhausted its administrative remedies and that its complaint is exclusively within the jurisdiction of the Emergency Court of Appeals. These contentions will be noticed.

1. Adverting to the provisions of the Emergency Price Control Act, and particularly section 902(e), Title 50 U.S.C.A. Appendix, the following appears to be apposite:

"Provided, That in the case of any commodity which has heretofore or may hereafter be defined as a strategic or critical material by the President pursuant to section 5d of the Reconstruction Finance Corporation Act (section 609j of Title 15) as amended, *such determination shall be made by the Federal Loan Administrator, with the approval of the President, and, notwithstanding any other provision of this Act (sections 901–946 of this Appendix) or of any existing law,* such commodity may be bought or sold, or stored or used, and such subsidy payments to domestic producers thereof may be paid, only by corporations created or organized pursuant to such section 5d (section 609j of Title 15); * * *."

It will be seen, therefore, that the subject matter of this action was completely taken out of the Emergency Price Control Act and transplanted in the exclusive sphere of the defendant's activities and under the law "subsidy payments to domestic producers," could be paid "only by corporations created or organized pursuant to such section 5d," etc., section 609j of Title 15 U.S.C.A.

Under the Directive of the President and the various interpretations thereof and from the statute it appears that the plaintiff is right, that the Government in every way assured a margin of profit to producers in the precise category of this plaintiff. Moreover, it appeared further that this was contractual and that such subsidy payments were to be made or to be assured by a corporation formed, as in this case, and known as Metals Reserve Company, a subsidiary of the defendant.

2. By the Act creating the defendant, section 603, Title 15 U.S.C.A., it is specifically provided that the defendant is not only authorized "to make contracts," but that it was, and is, also clothed with power "to sue and be sued, to complain and to defend, in any court of competent jurisdiction, State or Federal".

It became the duty of the Metals Reserve Company to assure or to guarantee to the defendant as a domestic producer in its operations in marginal mines, "a fair margin of profit." It did not do so according to the averments of the complaint, and, since it failed to do so, the defendant having assumed its liabilities, the plaintiff is authorized by express statute to sue the defendant.

3. The next question is whether the Emergency Court of Appeals has or had exclusive jurisdiction. Title 50 U.S.C.A. Appendix, § 924, contains the following recital:

"(a) Any person who is aggrieved by the denial or partial denial of his protest may, within thirty days after such denial, file a complaint with the Emergency Court of Appeals, created pursuant to subsection (c), specifying his objections and praying that the regulation, order, or price schedule protested be enjoined or set aside in whole or in part."

Adverting to section 923 of said Title, it is there provided that:

"(a) At any time after the issuance of any regulation or order under section 2 (section 902 of this Appendix), or in the case of a price schedule, at any time after the effective date thereof specified in section 206 (section 926 of this Appendix), any person subject to any provision of such regulation, order, or price schedule may, in accordance with regulations to be prescribed by the Administrator, file a protest specifically setting forth objections * * *."

It is obvious from the foregoing that this procedure refers specifically and alone to the Emergency Price Control Act and orders and regulations that might be made and promulgated thereunder by the Administrator and has nothing to do with the subsidy arrangement for strategic and critical materials provided by a separate and distinct governmental agency, such as in this case.

4. Counsel for the defendant is right in the assertion that the defendant is in effect an alter ego of the Government. The statute of its creation, Title 15 U.S. C.A. § 603, provides, among other things:

"(a) * * * The Corporation shall be entitled to and granted the same immunities and exemptions from the payment of costs, charges, and fees as are granted to the United States * * *. The Corporation shall also be entitled to the use of the United States mails in the same manner as the executive departments of the Government."

Other provisions of the statute give defendant an extensive field of activity and permit it to function "without regard to the provisions of any other laws governing the expenditure of public funds, and such determinations shall be final and conclusive upon all other officers of the Government."

It would follow from the foregoing that the motion to dismiss should be overruled and proper arrangements should now be made for the trial of the issues.

### On Motion for Reconsideration and Rehearing

Counsel for the defendant have filed a vigorous motion for a reconsideration and rehearing on the question of jurisdiction. In such motion it is charged that, "The Court's decision * * * is squarely in conflict with established law," and, apparently with very high confidence, counsel say that the cases cited in the briefs and quoted at length in such briefs show that: "In all these respects the meat subsidy program and the Premium Price Plan for Copper, Lead and Zinc were exactly parallel." And that, "For jurisdictional purposes any attempted distinction between the meat subsidy program and the Premium

Price Plan for Copper, Lead and Zinc is utterly untenable." The authorities mentioned by counsel have been re-examined, and the following conclusions have been reached:

1. It should be kept in mind that, if the averments of the plaintiff are true, it sustained heavy losses in its efforts to provide the government with strategic and critical materials in a time of war. In doing so, it had been assured of subsidies to protect it against losses and to afford a fair margin of profit. In its effort to recover its claimed losses it is challenged by counsel for the government as having failed to bring itself within such provision of law that would enable it to secure an adjudication on the merits of its claim. The plaintiff is confronted with a wilderness of ukases, directives and regulations, many of which are designed to defeat recovery and to accomplish forfeitures. As nature abhors a vacuum, so does the law abhor a forfeiture. Not only should a benign and benevolent sovereign hold itself always in readiness to meet fairly and honestly its obligations and the just claims of its subjects but the judges should be alert to protect a litigant against defeat of a claim if meritorious and just.

The foregoing should be a postulate to the consideration of every case where, as here, the government is involved and the rights of the claimant are hedged about with confusing regulations.

2. Adverting to the first case cited by learned counsel, being Illinois Packing Co. v. Bowles, Em.App., 147 F.2d 554, loc. cit. 556, 558 and 559, the pronouncements of that case and such as were relied upon by counsel were characterized by the author himself in a subsequent opinion as pure obiter dictum. In his obiter dictum the court said:

"Our jurisdiction under § 204(a) is limited to entertaining a complaint by any person 'who is aggrieved by the denial or partial denial of his protest'. The 'protest' referred to carries back to § 203(a), which provides that, 'after the issuance of any regulation or order under section 2', any person subject thereto may, in accordance with regulations to be prescribed by the Administrator, file a protest specifically set-

ting forth his objections to the regulation or order. * * * *Thus it is clear that our jurisdiction under § 204(a) to set aside regulations or orders is limited to regulations or orders issued under § 2 of the Act, and then only after a protest duly filed under § 203(a) has been denied in whole or in part.*" (Emphasis mine.)

And then, 147 F.2d loc. cit. 558:

"It is true that our main concern has been, as it was expected to be, with price and rent regulations; *and we have not found in the legislative history any express recognition by Congress that our jurisdiction extended also to reviewing the validity of subsidy regulations issued under § 2(e).*" (Emphasis mine.)

And then, in relation to the protest made in that case, 147 F.2d loc. cit. 558, the court said:

"Amendment No. 2, the order challenged by complainant, *was not issued by the Price Administrator, and could not be revoked or amended by him. He had no power in the premises.* * * * (Emphasis mine.)

"The protest, therefore, was not a protest properly filed with the Price Administrator pursuant to § 203(a) of the Act, and the Administrator had no choice but to dismiss the protest."

In this obiter dictum the court justified its jurisdiction in a proper case when it said, 147 F.2d loc. cit. 559:

" * * * we think the suggestion of the Administrator is correct that the protest and review procedures in §§ 203 and 204 *'would follow the regulatory power.'*" (Emphasis mine.)

And then, after this bit of judicial legislation, it was further said on the same page:

"In other words, 'Administrator' as used in §§ 203 and 204 ought reasonably to be read as meaning the Price Administrator or any other department or agency of the government *to which has been transferred the statutory functions of the Price Administrator with reference to regulating the prices of the commodity in question.*" (Emphasis mine.)

This last paragraph in the court's obiter dictum has formed the basis for the entire contention in this case. Later on, the same judge, Honorable Calvin Magruder, of the First Circuit, sitting in the United States Emergency Court of Appeals, said, in Illinois Packing Co. v. Snyder, 151 F.2d 337, 338:

"Taking its cue from our obiter dictum thus expressed, Illinois Packing Company started over again."

And then, to justify the court's obiter dictum, 151 F.2d loc. cit. 339, the court said:

"Furthermore, it is hardly accurate to describe the meat subsidies as a gratuity or bounty. *Such subsidies are closely articulated with the price control program, and, as contemplated by Congress, may operate as compensatory in nature so as to validate a lower level of legal maximum prices than otherwise would be permissible under the standards laid down in the Price Control Act for the guidance of the Price Administrator.*" (Emphasis mine.)

Quite clearly the subsidies in the case at bar are not "closely articulated with the price control program," but, on the contrary, are set apart and have a full and complete code of their own for subsidizing strategic and critical materials such as lead and zinc.

In the case of Earl C. Gibbs, Inc., v. Defense Supplies Corporation, Em.App. 155 F.2d 525, loc. cit. 526, the court again attempted to justify its reach for jurisdiction when it said:

"Subsequently, pursuant to a Directive of the Economic Stabilization Director issued October 25, 1943, * * * *the payment of this general subsidy to all cattle slaughterers was tied in with an elaborate cattle stabilization plan designed to operate as an indirect control of cattle prices so as to give needed relief to the meat industry.*" (Emphasis mine.)

It is idle for counsel to say that, "In all of these respects the meat subsidy program and the Premium Price Plan for Copper, Lead and Zinc were exactly parallel." Counsel could not have been serious in this strong statement. Nor was counsel justified in saying, "For jurisdictional purposes any attempted distinction between the meat subsidy program and the Premium Price

Plan for Copper, Lead and Zinc is utterly untenable."

Judge Magruder also wrote the opinion in Wm. Schluderberg-T. J. Kurdle Co. v. Reconstruction Finance Corporation, Em. App., 169 F.2d 419, and loc. cit. 423, he again said:

"We think that these provisions, taken as a whole, sufficiently emphasize the tie-up between subsidies and maximum prices imposed by law, and indicate a congressional purpose to condition the subsidy-paying authority upon the continued existence of price controls on the commodity or commodities to be subsidized." (Emphasis mine.)

As was pointed out in the memorandum opinion heretofore filed, the strategic and critical materials in this case were zinc and lead, and the plaintiff was encouraged to produce in marginal and ordinarily non-paying or non-profitable mines. Such operations were carried on upon the theory and assurance that the government would make good its guaranty that the plaintiff would be protected against loss by subsidization and would be assured of a fair margin of profit.

The case of Atlantic Meat Co. v. Reconstruction Finance Corp., 1 Cir., 166 F.2d 51, vouchsafes no help on the questions here involved. In that case the plaintiff sought a declaratory judgment and in doing so prayed for a decree that certain regulations were invalid. The case was ordered dismissed by the court for the reason that the productions which formed the subject matter of litigation were "not agricultural commodities", etc. Again there is no parallel between the reasoning of the court in the meat cases and the case at bar.

In the case of Armour & Co. v. Reconstruction Finance Corporation, Em.App., 162 F. 918, loc. cit. 922, the court again said, as justifying its jurisdiction:

"We have also previously pointed out that these subsidies were not mere gratuities or bounties but were closely articulated with the price control program and operated as compensatory in nature so as to validate a lower level of legal maximum prices than otherwise would have been permissible under the standards laid down in the Act for the guidance of the Price Administrator." (Emphasis mine.)

In the case of Samett v. Reconstruction Finance Corporation, 165 F.2d 605, 607, the Court of Appeals Tenth Circuit affirmed a dismissal of the action because, "The directive itself was attacked on the ground of being illegal, null, and void. It was not a case where administrative action or nonaction under a valid regulation was challenged." (Emphasis mine.)

3. The entire procedure with respect to the encouragement of mining operations was different from that relating to the production of meat. A Premium Price Plan Quota Committee was created whose duty it was to determine an appropriate subsidy for the plaintiff in its mining operations. The Committee tentatively fixed a subsidy for a definite period which it believed would be adequate, "to provide for a fair margin of profit." According to the plaintiff such subsidy was inadequate. There was no provision in the law, as stated by Judge Magruder, for review by the Emergency Court of Appeals and the facts in this case would not justify legislation by construction. In the meat subsidy cases Judge Magruder bridged the hiatus, or judicially legislated, by reasoning that the meat sibsidy program was so articulated and intermingled with the Price Control Act as to justify the court in assuming jurisdiction. There was no "parallel" to that in this case. No reason appears as yet why this plaintiff should not have an opportunity to establish its right, if it has such right, to recover a subsidy assured to it, as it claims, by the government.

4. The insistence of able counsel for the defendant that the law declared by Judge Magruder in the meat subsidy cases is applicable here would seem to make it imperative for counsel on both sides to collate all the statute law, directives and regulations relating to the subsidies for meat and metals and place such statutes, directives and regulations alongside each other and then it would be easily ascertainable what should be done. This should be done at once so that if Judge Magruder has spoken or made the law applicable to these non-kindred cases, then, as indicated by counsel, the plaintiff may not pursue a will-o'-the-

wisp and the government should not be put to the expense of a defense that for plaintiff is insurmountable.

At the present time an order will be made overruling the motion for a rehearing.