MacARTHUR MINING CO., Inc. v. RECONSTRUCTION FINANCE CORPORATION.

No. 4985.

United States District Court
W. D. Missouri, W. D.

Nov. 22, 1949.

Inghram D. Hook and Harry L. Thomas, of Hook & Thomas, and John W. Hoffman, Jr., Kansas City, Mo., for plaintiff.

George Arthur Fruit, Atty., Dept. of Justice, Washington, D. C. and Harold W. Sheehan, Washington, D. C., of counsel, R. F. C., Sam M. Wear, United States Attorney, by Earl A. Grimes, Special Assistant to the United States Attorney, Kansas City, Mo., Rufus Burrus, of Burrus & Burrus, Independence, Mo. (Joseph M. Friedman, Special Assistant to the Attorney General, on the brief), for defendant.

REEVES, Chief Judge.

This is an action on an alleged contract for the production of Lead and Zinc in marginal or submarginal or low-producing mines in the tri-state mining area or district of Missouri, Kansas and Oklahoma. In the years 1943 and 1944 the Government was involved in one of the bloodiest and most devastating wars of human history. It was then in dire need of such strategic and critical materials as metals and minerals. The Congress, under constitutional warrant had wisely conferred upon the executive department plenary war powers. Full authorization by Congress was conferred upon the President to do such things as would make effective the successful prosecution of the war.

Among other created agencies or instrumentalities of the Government was a board designated as the War Production Board. As its name implies, the object of the Board was to stimulate and supervise the production of material and other essentials and implements of war. On April 17, 1943, the Chairman of the War Production Board perceived a serious shortage in minerals and metals necessarily useful and essential in war. To stimulate production of such strategic and critical materials he communicated with the President in a letter to be made public. By such communication he outlined the policy of the Government, which he believed would stimulate production. These policies were approved by the President and promulgated, in the following language: "I approve them and make them public. I do approve these policies and I am making them public in this letter

to you." There could, of course, be but one design in thus acquainting the public with the policies of the Government with respect to strategic and critical metals and minerals, and that was to invite the public or an interested portion to respond to the invitation thus extended and to cooperate in the production of such strategic and critical materials.

The policy thus promulgated by the government was not designed to attract the attention of operators owning profitable and well paying mines but to encourage the production of such metals and minerals in marginal and submarginal mines, so that all potential and available metals and minerals might be recovered from the earth and made useful in the prosecution of the war. The policy of the Government was not only to encourage mining in marginal and ordinarily non-paying mines but to insure operators against loss and to afford them a fair margin of profit. To effectuate this purpose sundry corporate arms of the Government were formed, including Metals Reserve Company, a wholly owned subsidiary of the defendant.

Of course limitations were placed in the policy outlined by the government, which limitations were designed to protect the Government against expensive operations with practically negative returns. The Government properly claimed the right to supervise and to approve in advance proposed operations of mines or areas as worthy and entitled to the aid the Government was promising to give. The plaintiff proposed to the Government the operation of a mine situated in the above mentioned tri-state area and agreed to accept the assurance of the Government to provide for it a fair margin of profit as well as the reparation of any losses that might be sustained. Through the proper arms or agencies of the Government this proposal was accepted. Inspection of the proposed mining operations proved satisfactory. These matters not being controverted, the plaintiff, with the approval of the Government, continued its operations through the years 1943 and 1944 and thereafter.

For the production in operations such as that of the plaintiff a Quota Committee and

reviewing officers were provided to carry out the obligations of the Government through its announced policies, and to arrange for appropriate premium payments above the prices fixed in the office of the Price Administrator. This was done, but notwithstanding such premiums or quotas, it is alleged that the quotas were inadequate to afford the plaintiff a fair margin of profit, and that, throughout the entire mining operations, and especially during the years 1943 and 1944, it protested the inadequacy of the premium payments, and did this not only because of the losses being sustained but also by reason of the failure to afford the plaintiff a fair margin of profit.

The plaintiff was urged by agents of the Government to continue its operations with the constant suggestion, and maybe promises, that the matter would be adjusted at the conclusion of the operations. Such adjustment was never made and the plaintiff has brought suit on two counts, claiming losses, as well as lack of a fair margin of profits for its operations during the years 1943 and 1944.

According to the evidence the losses accruing to it were $17,845.52, and a fair and reasonable margin of profit would have been $278,836.25, or an aggregate of $296,681.77. It sues for a larger amount but the above facts are reflected in the proof.

On the second count it alleges damages because of the reduction in the price per ton of Lead concentrates mined in the year 1946. The reduction was fixed at $10.30 per ton. On that count the testimony tended to show that, notwithstanding this reduction, the plaintiff still enjoyed a margin of profit. This profit it believed was inadequate and suit has been brought for an amount which it believed to be a fair and proper return. The evidence on the second count was too vague to enable the court to adjudicate in favor of the plaintiff. A discussion of that claim will be omitted from this opinion.

The defendant challenges the jurisdiction of the court and in many ways invokes technical provisions of the law to defeat recovery. Such matters were heretofore decided. D.C., 82 F.Supp. 455.

1. The marginal mine operated by the plaintiff was not only approved by the Government as an appropriate mining venture but the defendant actually extended a loan of a considerable sum, to-wit, $125,000 for initial operations.

In addition to this, the Metals Reserve Company actually paid premiums on account of the operations. This is mentioned for the reason that the Government, through its War Production Board, not only made a proposal, but accepted the counter-proposal on the part of the plaintiff and in all things undertook to carry out the contract made between the Government, through its corporate arms, and the plaintiff.

2. The several agencies of the Government were clothed with power to sue and be sued. This includes Metals Reserve Company, a wholly owned subsidiary of the defendant, now dissolved. All of its assets and liabilities have been transferred to and assumed by the defendant.

3. That a contractual arrangement actually existed between the Government, through its corporate arms, and the plaintiff is attested by proper officers of the Stabilization Administrator. In an exhaustive and logical opinion given by Honorable John C. Collet, Stabilization Administrator, the entire arrangement was considered as a commitment by the Government to vouchsafe to the plaintiff a recoupment of losses and a fair margin of profit. The arrangement was also approved in the office of the Solicitor General.

4. The whole aspect of the case is one showing a contract between the Government and its corporate arms or entities with the plaintiff. The contract was recognized by the Government and fully carried out by the plaintiff. The Government (or its corporate arm) is in default because it has not made good its promise to save the plaintiff harmless from loss and to assure it a fair margin of profit. On the contrary, the Government has taken refuge behind its sovereign armor. It has resorted to technicalities of the law for the purpose of defeating a just claim. A technicality has been well defined as a microbe which has gotten into the law and gives justice the

blind staggers. That is exactly the situation here. At a time when the Government was in dire distress, and when its hard problems justified it in making fair promises to its citizens, the plaintiff responded to its call for aid on account of the assurances above set out. Now that the war is over the Government should not attempt to seek sanctuary behind its sovereign armor until the wreckages of the war have been cleared away and the wounds of the war bound up.

The plaintiff is entitled to judgment, and same will be given.