mate submitted by Ward & Greene was to put the building in good condition and was not limited to damages beyond ordinary wear and tear. Section 8 of the 1942 lease requires restoration "reasonable and ordinary wear and tear and damages by the elements or by circumstances over which the Government has no control excepted." Section 9 makes repairs necessary through fair wear and tear or through circumstances beyond the control of the Government an obligation of the lessor. Clearly the Government is not liable for ordinary wear and tear occurring during its occupancy of the premises. Furthermore, the terminal survey report executed by both the plaintiff and the defendant expressly states that the Government agencies had "provided nominal maintenance to the property to the extent of their respective lease requirements." This report also recognized that there had been lack of maintenance on the part of the lessor and also included many items shown to be damaged for which claim was made at the termination of the WPA occupancy. The Ward & Greene estimate of $50,176.45 completely disregarded the terminal survey report. Thus we feel justified in disregarding this estimate.

At a later date plaintiff and defendant entered into a discussion with a view of determining the items for which the Government was responsible. A new list was prepared and Ward & Greene made a new estimate of the cost of repairing the items on this list. Their estimate totaled $7,409.05, and included ten percent for supervision. Mr. B. G. Lampe of the Construction Division, Veterans' Administration, made an estimate of the same list of items and his estimate totaled $3,675.

Ward & Greene were general contractors in the area and B. G. Lampe was a professional estimator in the employ of a large contractor. In this instance the firm of Ward & Greene was in the employ of the plaintiff and B. G. Lampe was in the employ of the Veterans' Administration.

We believe the last list submitted to plaintiff on which Ward & Greene made an estimate of $7,409.05 and B. G. Lampe made an estimate of $3,675, was a fair representation of the damages to the building in excess of "reasonable and ordinary wear and tear," under section 8 of the 1942 lease. We are aware that ordinarily plaintiff's evidence would tend to be high and defendant's witness would be apt to shade his testimony in favor of the defendant. Believing the estimate of $7,409.05 to be high and the estimate of $3,675 to be low, we know of no better method than that of applying the jury technique and "splitting the difference." This would leave us a figure of $5,542.05, which we believe to be the fair and reasonable cost of restoration of the building under the 1942 lease.

We conclude, therefore, that the transfer of the leased space in the Elks Temple building to the Veterans' Administration was not in violation of the terms of the 1942 lease. That plaintiff is entitled to judgment in the sum of $5,542.05, the cost of restoration of the building under the 1942 lease.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.

**VICTORIA MINES, Inc.**

v.

**The UNITED STATES.**

**No. 50344.**

United States Court of Claims.

Nov. 30, 1954.

was engaged in the mining and milling operations under the Government's Premium Price Plan for copper, lead, and zinc, as lessee and operator under an option to buy of a lead-zinc mine near Sheridan, Montana. All materials produced by plaintiff were furnished to designated agents of Metals Reserve Company. Plaintiff claims, because of its participation in the Premium Price Plan, that it is entitled to $70,200, representing a 90 percent return on its capital investment, $43,500 depreciation on its mill, and $209,000 representing a fair operating margin less $26,179 actual operating margin.

Upon stipulation of the parties the trial in this case was limited to the issues of law and fact relating to the plaintiff's right to recover.

After the plaintiff completed the presentation of its evidence, the defendant moved, pursuant to rule 49(b) of this court, 28 U.S.C.A., for a dismissal on the ground that upon the facts and law the plaintiff has shown no right to recover. The Commissioner recommends that defendant's motion be granted and that judgment be entered in favor of the defendant for dismissal of plaintiff's petition.

The question presented is: whether within the meaning of section 17(a) of the Contract Settlement Act of 1944 plaintiff arranged to furnish or furnished its mining facilities and/or materials to a contracting agency of the defendant or to a war contractor without a formal contract, and has not been paid fair compensation.

From 1937 to 1942 plaintiff operated the Broadway Mine and a 100-ton mill at Silver Star, Montana, in the development, production, and cyanidation of gold and silver ores.

When plaintiff's gold and silver mining operations were hampered by requirements of the War Production Board, Mr. John T. Potts, who was plaintiff's principal representative in all transactions, commenced a study of the possibility of producing strategic metals. When the War Production Board issued Limita-

Irving G. McCann, Washington, D. C., for plaintiff.

Edward L. Metzler, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LARAMORE, Judge.

This is an action based upon the provisions of section 17(a) of the Contract Settlement Act of 1944, 58 Stat. 665, 41 U.S.C. § 117(a) (1952), 41 U.S.C.A. § 117(a). Pursuant thereto plaintiff claims to be entitled to recover the sum of $296,521. During the period November 16, 1942 to June 30, 1947, plaintiff

tion Order L–208 on October 8, 1942, restricting gold mining operations, plaintiff's mill at Silver Star became idle. The mill was estimated by Mr. Potts to have then had a replacement value of $150,000. Plaintiff, despite the restrictions, continued to explore, develop and mine about 12 tons of lead gold ore per day for shipment to the American Smelting and Refining Company as this ore was a desirable smelting flux.

After the issuance of Limitation Order L–208, the manager of the American Smelting and Refining Company, Mr. E. McL. Tittman, whom Mr. Potts had known a long time, asked the Regional Technical Advisor of the War Production Board's Mining Branch at Helena, Montana, viz., Mr. W. A. Manning, to assist the plaintiff in producing this lead gold ore as a smelting flux. About the same time, Mr. Tittman also advised Mr. Potts that a small lead gold producer in the area was about to close its Toledo mine.

Mr. Potts and plaintiff's general manager promptly made an investigation of the Toledo mine which was located about four and one-half miles from Sheridan, Montana, and ascertained that the Toledo mine was a losing venture despite the receipt of premium payments under what was known as the Premium Price Plan. Thereafter, Mr. Potts informed Mr. Tittman of his investigations and also sought the help of Mr. Manning in obtaining a preference rating which would enable the plaintiff to lease and operate the Toledo mine. Mr. Manning visited both the Toledo mine and the Silver Star mill and obtained information as to plaintiff's plans. During this inspection, Mr. Manning, according to Mr. Potts, repeatedly stated that the Government was in dire need[1] of zinc, lead, and copper, that plaintiff's program was exactly what the Government wanted, and that he would back plaintiff all he could "in securing the necessary serial number to allow plaintiff to go ahead." Until late in 1944, Mr. Manning was also in contact with plaintiff at least once a month to be sure that plaintiff was carrying out its proposed operations and to help plaintiff in securing materials.

In order for the plaintiff to carry on lead and zinc operations, it was essential that it do so through the Anaconda Copper Mining Company, the only purchaser of zinc ores and concentrates in the area, and through the American Smelting and Refining Company, which operated the only smelter within 400 miles of plaintiff's mill. Mr. Potts consequently contacted Mr. Tittman and Mr. L. R. Margetts, the respective representatives of those companies to ascertain if their companies would accept plaintiff's concentrates and what price they would pay.

About the middle of November 1942, Mr. Potts, on behalf of plaintiff, entered into an operating agreement with the former operators of the Toledo mine under which plaintiff would operate that mine. About the same time, Mr. Potts also saw the opportunity to pick up seven or eight mining claims adjoining the Toledo mine. These were owned by the Buckeye Corporation. Mr. Potts personally acquired and subsequently leased the Buckeye holdings to plaintiff without, however, receiving any payments from plaintiff as a result.

On December 15, 1942, plaintiff sent Mr. Manning a formal written application for a serial number under Preference Rating Order P–56 with which to operate the Toledo mine. Plaintiff also enclosed a letter to the War Production Board's Mining Branch which represented that plaintiff had positive ore reserves of 15,000 tons and probable reserves of 50,000 tons. Plaintiff stated:

"The average analysis of material shipped during the last 12 months is: * * * 9,807 percent Pb, 4.249 percent Zn, * * *. However, the zinc content has increased to such an extent on ore mined lately —the most recent shipment carrying 9.8 Zn against 8.4 Pb—that it

1. It is noted that in a letter dated January 28, 1943, a higher official of the War Production Board advised Mr. Potts personally that "the need for lead * * * is very indefinite but there is a demand for zinc."

seemed advisable to carry out a development program to ascertain if sufficient tonnage could be made available to warrant the consideration of selective milling.

"The development program has now blocked out a positive 15,000 tons of millable ore and indicates that we can count on at least another 150,000 tons of similar material. * * *

"Our mill located here at Silver Star can be altered with a very reasonable expenditure of money, labor, and materials, all of which are now available, to handle this ore along with other lead ores in this immediate vicinity."

In January 1943, Mr. Earl Trager of the War Production Board's Mining Economics Sections, Mining Division, and Chief of its Serial Numbers Section, inquired by telegram if plaintiff intended to convert its mill to recover zinc if a serial number was granted. Plaintiff then replied that its mill was already being converted for zinc and lead and that it needed only $1,500 worth of new equipment, plus reagents, in addition to $8,000 worth of used equipment on hand; also, that it had 20,000 tons of ore blocked averaging an estimated four percent lead and six percent zinc.[2]

On January 29, 1943, Mr. Potts also contacted a Mr. George Heikes, then Director of the Zinc Division of the War Production Board at a time Mr. Heikes was at Butte, Montana, on other business. This was in an effort to obtain a serial number. Mr. Potts states that upon viewing samples of ore shown by him to Mr. Heikes, the latter exclaimed in substance that the Government was doing everything possible to obtain such ores because the zinc situation was in terrible condition. It appears that plaintiff had just broken into a nice body of ore as high as 10 percent of zinc, and Mr. Potts probably showed such samples to Mr. Heikes. As later experience showed, these samples were far from representative or average. Mr. Heikes is reported to have then stated that he could do nothing at that time but he was certain that plaintiff would receive further advice from the War Production Board about its application. Several weeks later plaintiff did receive the serial number, but there is no evidence that Mr. Heikes had anything to do with this.

Effective February 1, 1942, and until June 30, 1947, there was in operation what is known as the Premium Price Plan for copper, lead, and zinc. Under the Plan price ceilings were maintained but new or marginal production was stimulated by premium payments. This Plan was authorized and administered under the Emergency Price Control Act of January 30, 1942, 56 Stat. 23, 50 U.S.C.A.Appendix, § 901 et seq. The rules and regulations by which the United States mine operators might obtain premium prices for over quota production of copper, lead, and zinc were issued by the Office of Price Administration on February 9, 1942. The established maximum or ceiling prices were then 6.50 cents for lead, 8.25 cents for zinc, and 12 cents for copper. Under this Plan the Metals Reserve Company[3] had an-

2. In writing Mr. Potts about his Jack Rabbit mine, Mr. Trager stated that it "would appear desirable" for Mr. Potts (as owner of the Jack Rabbit mine) to make every effort possible to expedite the conversion of plaintiff's mill so as to be in a position to produce strategic metals.

3. The Metals Reserve Company was created on June 28, 1940, under section 5d (3) of the Reconstruction Finance Corporation Act. It was dissolved June 30, 1945, and its functions, powers, and du-

ties transferred to the R. F. C. July 1, 1945. 15 U.S.C. § 606b (3) [now 15 U.S.C.A. § 604]; (Executive Order No. 9071, February 24, 1942; 59 Stat. 5, 12 U.S.C. § 1801; 59 Stat. 310, 15 U.S.C.A. § 611 note). Section 5d (3) of the Reconstruction Finance Corporation Act of 1932 as amended, 15 U.S.C. § 606b (3), authorized the Federal Loan Administrator with the approval of the President, to take such action as the President and the Federal Loan Administrator deemed necessary to expedite the national defense.

nounced that for a period of two and one-half years beginning February 1, 1942, and ending July 31, 1944, it would pay fixed premium prices for over quota production of copper, zinc, and lead. The quotas were to be fixed by a Quota Committee composed of War Production Board and Office of Price Administration representatives. The Metals Reserve Company was to pay premiums per pound of up to 5 cents for copper and 2.75 cents for lead or zinc. The premiums were to be paid through the smelting companies "designated as agents for Metals Reserve Company to obtain and transmit the necessary data required for the making of premium payments" on the basis of the affidavits of producers. The premiums Price Quota Committee which was created within the War Production Board was "to establish and assign production quotas."

On February 22, 1943, immediately after plaintiff had received a War Production Board serial number for the operation of the Toledo mine, the plaintiff wrote the Secretary of the Quota Committee and applied for a "copper, lead and zinc quota" so as to be "eligible for premium payments." Also, on February 22, plaintiff, having heard of the additional premiums announced on February 18, requested the higher premiums as its operations would otherwise be "marginal or possibly submarginal." Plaintiff represented that its ore would assay four percent lead and six percent zinc.

On March 10, 1943, the Secretary of the Quota Committee wrote plaintiff that its request was denied because plaintiff's estimates indicated a slight margin but the Secretary sent plaintiff forms with which to apply for higher premiums if this was necessary. The Secretary's letter stated:

"The foregoing should not be construed to mean that the Committee is offering any guarantee or promise that the quotas will be adjusted. This can only be determined in light of circumstances existing at the time an application for quota revision is received."

Plaintiff accepted this decision and continued its operations without any protest. It did not at this time nor at any time thereafter until its claim was filed in 1950, ever verbally or in writing communicate with any representatives of the pertinent Government agencies or with any Government agency and inform them that plaintiff was in any way relying on any conversations or instructions or requests to proceed by Messrs. Manning, Heikes, Tittman, Margetts, Trager, or others.

On March 25, 1943, the Quota Committee wrote plaintiff and assigned it a zero quota for the operation of the Toledo mine. The quota letter sets out the terms under which a quota was issued and the Metals Reserve Company was to make payment.

In June and July 1943, the plaintiff wrote the Secretary of the Quota Committee and requested further premiums. As a result, plaintiff received quotas permitting payment, in addition to the 6.50 cents and 8.25 cents ceiling prices on lead and zinc, of premiums of 5.50 cents per pound for lead and 8.25 cents per pound for zinc. In each instance Mr. Potts, either as plaintiff's president or as president of the Galigher Company, wrote the War Production Board officials in Washington personally and requested their assistance.

Without any apparent consultation or advice to Messrs. Tittman, Margetts, Manning, or Trager, plaintiff also acquired the Buckeye group of claims from Mr. Potts and included them in its Premium Price Plan operations. Upon plaintiff's request all production from the Buckeye claims was included under the Toledo quota. This was done retroactive to July 1, 1943.

In July 1944, plaintiff advised the Quota Committee that its losses from November 1942 to June 30, 1944, on operations as a whole were $15,609.64, but that plaintiff still hoped to break even on its marginal venture.

In September 1944, the Quota Committee advised plaintiff that its production for the year ending July 1, 1944, was only two-thirds the tonnage expected and that its crude ore "averaged roughly, one-half the grades anticipated" and that "it would be in order for you to apply for a revised quota and furnish a new forecast of operations" for which applications were enclosed. Plaintiff then replied that in view of improved operations it would not seek a revision.

Plaintiff continued its operations under the Premium Price Plan in 1945, constantly expecting to operate profitably but ending the calendar year with a zinc production deficiency of 202,360 pounds. Early in 1946, plaintiff wrote the Quota Committee that although the "Committee has always treated us fairly," plaintiff's operations had resulted in a deficiency in its zinc production, the grade of its ore had declined in quality, and therefore plaintiff requested premiums on all zinc, retroactive, if possible. Plaintiff estimated its losses at $8,000 in 1945, but hoped for better things. Its lack of success, however, did not deter it from taking, on March 30, 1946, a seven-year lease on the Toledo mine claims, with an option to buy.

On May 10, 1946, the Quota Committee cancelled plaintiff's production deficits, reduced its quotas, and increased its premiums retroactively. Its zinc premium was then twice the ceiling price and its lead premium more than double that price.

On July 25, 1946, the Premium Price Plan was extended through June 30, 1947. Thereafter, plaintiff requested further assistance which the Quota Committee granted. Plaintiff's final price was 17.50 cents per pound for zinc, 15.75 cents for lead, and 28 cents for copper.

Although Congress subsequently extended the Premium Price Plan for two years, the President vetoed the bill.

The Contract Settlement Act of 1944 was approved July 1, 1944, but it was not until April 1950 that plaintiff presented its claim. Plaintiff then contended its claim was based upon a contract with the Metals Reserve Company or alternatively upon section 17(a) of the Act. Plaintiff also contended its action was taken in reliance on publicized letters of Donald M. Nelson, the Chairman of the War Production Board, and President Roosevelt.

October 6, 1950, both the Reconstruction Finance Corporation and the Department of Commerce rejected plaintiff's claims stating they were unable to find that a formal contract existed between the petitioner and Metals Reserve Company or the War Production Board which was terminated for the convenience or at the option of the Government. The section 17(a) claim was denied for lack of evidence that plaintiff had ever furnished or arranged to furnish anything to the War Production Board, Reconstruction Finance Corporation, Metals Reserve Company, or to a war contractor in reliance either on them or on their representatives. The decision of the Reconstruction Finance Corporation also pointed out that the agency of the private concerns which disbursed the premiums was "limited solely to matters concerned with the calculation and payment of such premiums." On appeal, the Appeal Board of the Office of Contract Settlement on July 11, 1951, affirmed the aforesaid findings and decisions.

Under section 13 of the Contract Settlement Act, 41 U.S.C.A. § 113, these findings are to be regarded as *"prima facie* correct."

Section 17(a) of the Contract Settlement Act of 1944 provides:

"Where any person has arranged to furnish or furnished to a contracting agency or to a war contractor any materials, services, or facilities related to the prosecution of the war, without a formal contract, relying in good faith upon the apparent authority of an officer or agent of a contracting agency, written or oral instructions, or any other request to proceed from a contracting agency, the contracting agency shall pay

such person fair compensation therefor."

This case turns on two propositions: (1) whether plaintiff has established that it furnished its mining facilities to a contracting agency of defendant or to a war contractor and, if so, whether it was furnished *pursuant to any contract, defective, informal, or quasi* within the meaning of section 17(a); (2) whether plaintiff has established that its mining operations were undertaken because of its reliance in good faith upon the apparent authority of an officer or agent of a contracting agency.

Section 17(a) of the Contract Settlement Act, supra, obviously requires the existence of some kind of contract, be it defective, informal, or quasi, as a prerequisite to payment or compensation. Section 17(a) was designed to carry out contract agreements which had not then been sufficiently formalized. It may be said that the "contract" required by section 17(a) is any situation defined therein where a formal contract does not exist. The petition does not allege and the proof does not disclose that plaintiff entered into any negotiations or contract relations with a contracting agency of defendant or with a war contractor whereby the parties in any way contemplated that plaintiff would furnish its mining facilities to a contracting agency or to a war contractor. The facts of the instant case fail to meet the requirements of section 17(a) in this respect.

The evidence does not establish that during the period from October 1942 through June 30, 1947, or during any part thereof the plaintiff furnished its mining or milling facilities, ores, concentrates, metals, or services to any contracting agency of the defendant or to a war contractor.

The petition alleges that plaintiff's operations were undertaken under the Premium Price Plan and that all metals produced were "furnished to designated agents of the Metals Reserve Company."

The evidence shows that during such operations, the American Smelting and the Anaconda Companies were fiscal agents of the defendant's Metals Reserve Company for the limited purpose of distributing premium payments authorized under the Premium Price Plan and disbursed all such payments to the plaintiff. The smelting companies for themselves paid the plaintiff the selling prices less smelting charges on the metals extracted from the concentrates.

The evidence fails to establish that the smelting companies were authorized to or did in fact provide the plaintiff's concentrates or the metals derived therefrom for the account of the Metals Reserve Company or any other department or ageny of the defendant.

It is reasonable to conclude that the smelting companies received the plaintiff's ore concentrates and paid for the metals derived therefrom for their own accounts for the purpose of selling the metals to any purchaser having authority to buy under existing priority regulations of the War Production Board.

Plaintiff apparently has abandoned the theory that it furnished metals to designated agents of the Metals Reserve Company. Plaintiff now states in its brief that it "did not furnish metals directly to a contracting agency" but contends that "metals were furnished to a war contractor." In this plaintiff appears to be talking not about its mining facilities for which it is making claim but about zinc and lead concentrates sold to smelting companies.

In view of the apparent abandonment of the contention that plaintiff furnished its facilities to defendant the next question is whether they were furnished to a "war contractor."

It is quite apparent from the evidence that plaintiff did not furnish the items which are the subject of its claim to a "war contractor," i. e., to either the Anaconda Copper Mining Company or to the American Smelting and Refining

Company. The plaintiff's claim is computed as follows:

Return of 90% of the cost of its war capital investment in the Toledo-Buckeye mine and in conversion of the Silver Star mill.. $70,200

Depreciation on Silver Star mill... 43,500

Fair operating margin on wartime operations .................... 209,000

Total .................... 322,700

Less operating margin............ 26,179

Total .................... 296,521

There is no proof that plaintiff's sales to either Anaconda Copper Mining Company or to the American Smelting and Refining Company were "without formal contract." We believe such proof to be required by the plain language of section 17(a), supra. This court, in the case of Rice Barton Corporation v. United States, 88 F.Supp. 271, 275, 115 Ct.Cl. 575, 592–593, said: " * * * The clear intent of the statute is to reach those inequitable situations where material was furnished to the Government which was not covered by a contract * * *."

While we do not consider as evidence the letter from the Legal Department of the Anaconda Copper Mining Company, as set out in plaintiff's brief, we point out that said letter disproves that plaintiff's transactions with Anaconda Copper Mining Company were "without formal contract." The letter recites that from March 1943 to June 1947, Anaconda Copper Mining Company received plaintiff's zinc concentrates "under a purchase contract dated February 8, 1943, as extended and amended from time to time." Plaintiff has failed to produce this contract and its failure authorizes the conclusion that its contents would be more favorable to the defendant. Furthermore, the contract with the Anaconda

Copper Mining Company dated February 8, 1943, is not shown to be related to any "war contract" or contracts with government agencies. It cannot be conceived that all government contracts were war contracts, nor does the letter from Anaconda's legal department so state. Cf. Richardson v. United States, 86 F.Supp. 1019, 114 Ct.Cl. 695, 697–698.

The mere fact that Anaconda Copper Mining Company and the American Smelting and Refining Company may have made millions of dollars in sales to war contractors does not make those companies *ipso facto* war contractors in dealing with plaintiff. The actual role of these companies is set out earlier in this opinion. Plaintiff says that it received numerous communications from responsible officials connected with the Premium Price Plan [4] before it began production and that such representations were designed to and did induce plaintiff to take part in the "Plan" under the representation that it was the established policy of the United States to provide fair return over the costs of production to mine operators taking part in the "Plan." Plaintiff further says it continued to produce strategic materials under the Plan, relying on the apparent authority of these officials, and that after urgings to increase production at all costs, it did so despite the fact that premiums received were never adequate to provide fair compensation.

The evidence fails to establish that during the period the Premium Price Plan was in operation, or during any part thereof, the plaintiff produced its ore concentrates, or the metals extracted therefrom, in reliance upon any apparent or actual contractual authority of any officer or agent of defendant, or in reliance upon any written or oral instructions, or any other request to proceed from any agency of the defendant. No representative of the Metals Reserve

4. The Premium Price Plan was authorized under the provisions of 50 U.S.C.App. § 902(e), 50 U.S.C.A.Appendix, § 902(e), and its purpose was to obtain a maximum necessary production of strategic materials. Quotas were fixed by the Quota Committee composed of representatives of the War Production Board and the Office of Price Administration.

Company, the War Production Board, or any other agency of the defendant, promised the plaintiff any compensation in addition to the amount paid under the Premium Price Plan.

It is apparent that plaintiff did not rely upon the conversations with representatives of the War Production Board. Mr. Manning, Regional Technical Advisor, Mining Branch at Helena, Montana, merely assisted plaintiff in obtaining the required priorities and serial numbers. Plaintiff's contact with Mr. Heikes, Director of the Zinc Division of the War Production Board, was to obtain assistance in securing a serial number. After showing him a sample of ore, Mr. Heikes supposedly said such ore was urgently needed and he was certain the War Production Board would so advise plaintiff. Mr. Trager of the War Production Board's Mining Economic Section, Mining Division, and Chief of its Serial Numbers Section, at no time requested that plaintiff do anything. It would seem absurd to contend that plaintiff, because of the conversations above, embarked upon a program in which it allegedly expended $1,154,847. Hence, we do not believe that the War Production Board's representatives induced plaintiff to proceed and their actions did not amount to a contractual arrangement under section 17(a), supra. Cf. Alabama Flake Graphite Company, v. United States, 125 Ct.Cl. 635.

Plaintiff contends that it produced in reliance upon the apparent and actual authority of three agents and officers of the War Production Board and the apparent authority of two responsible officials of the war contractors and is fully qualified to claim under section 17(a), supra. We find no evidence in the record to sustain this contention. The actions of Messrs. Manning, Heikes, and Trager, as stated earlier in this opinion, were not in the nature of contractual arrangements, nor did they induce action for which section 17(a), supra, imposed liability. Furthermore, it is quite apparent from the reading of section 17(a) that it affords no remedy where reliance is placed on actions of "responsible officials of a war contractor." The act plainly states " * * * relying in good faith upon the apparent authority of an *officer or agent of a contracting agency* * * *." The only acts of the smelting companies or their employees, E. McL. Tittman, Manager of the East Helena Plant, American Smelting and Refining Company, and L. R. Margetts, Superintendent of the Washoe Sampler Plant of the Anaconda Copper Mining Company, were for themselves, except in disbursing premium payments as fiscal agents of the Metals Reserve Company. Plaintiff had received all that was due under the Premium Price Plan.

Paragraph 6 of the petition indicates that the representation of the five men, *viz.,* Messrs. Manning, Heikes, Tittman, Margetts, and Trager, induced plaintiff to take part in the Premium Price Plan and that plaintiff's actions were induced by and in reliance on that Plan. The evidence fails to show that any of the five mentioned persons had any evident connection with the Plan and thus could not have been "responsible officials" as stated in the plaintiff's petition.

The record shows that plaintiff never furnished its facilities to defendant. Plaintiff produced ore concentrates which it sold to smelting or refining companies. The record further shows that plaintiff produced these ores or metals after applying for and receiving a series of letters containing express promises to pay specified premiums under the Premium Price Plan.

Plaintiff's receipts for the period November 16, 1942, to June 30, 1947, were $1,181,006 of which $595,010 was in the form of premium payments. It would seem that plaintiff's activities were in reliance on the formal quotas and premiums rather than the statements of Messrs. Manning, Heikes, Tittman, Margetts, and Trager, as heretofore enumerated.

Defendant contends further that plaintiff's activities after the cessation of hostilities were not "related to the prosecution of the war" and that no officer,

agent, or contracting agency of the Government could lawfully contract to pay plaintiff more than the O. P. A. ceiling prices as increased through the Premium Price Plan for copper, lead, and zinc, and that consequently plaintiff's claim is without legal basis. While we feel there is perhaps merit in these contentions, we are not called upon to decide these questions in the settlement of the issues herein.

We find that plaintiff has failed to prove either that it furnished its mining facilities to a contracting agency of defendant or to a war contractor pursuant to any contract within the meaning of section 17(a) or that its mining operations were undertaken because of its reliance in good faith upon the apparent authority of an officer or agent of a contracting agency.

The evidence fails to support plaintiff's claim and its petition is dismissed.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.

### Donald W. RILEY
v.
### The UNITED STATES.
No. 492-53.

United States Court of Claims.
Nov. 30, 1954.

Donald W. Riley, pro se.

Arthur E. Fay, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN, and LARAMORE, Judges.

JONES, Chief Judge.

Plaintiff is a veteran entitled to the benefits of the Veterans' Preference Act of 1944, 5 U.S.C.A. § 851 et seq. He was employed as an accounting clerk, EO-9, at a salary of $2,600 per annum in the Reconstruction Finance Corporation, Washington, D. C., effective February 24, 1944. On May 17, 1947, he was in the same position but the salary was $3,420 per annum.

On May 18, 1947, due to a reduction in force, plaintiff was changed from a grade 9 position to an accounting clerk's position, grade 8, at $3,021 per annum. Effective at the close of business August 29, 1947, he was separated from this position on account of a reduction in force procedure. He claims damages by reason of an alleged improper reduction in grade. The reduction was effective May 18, 1947. The petition was not filed until August 4, 1953. This part of plaintiff's claim is therefore barred