Dureee, Judge,
delivered the opinion of the court: [1]
This Congressional Reference case arises from the wartime metal and mineral needs which resulted in a declaration of national policy with respect to the War Metals and Minerals Mining Program promulgated by President Roosevelt on April 24,1943.
The statement of policy is set forth in a letter written to the President by Donald M. Nelson, Chairman of the War Production Board on April 17,1943.
This letter, which is set forth in full in Finding 11, was .adopted by President Roosevelt in his promulgation of the National Policy. Of immediate interest is paragraph 5 of 'that letter which reads:
5. It is national policy that labor, materials, transportation, and time to get into production, rather than money cost, are to be considered the controlling factors in deciding whether or not to increase production, but that the price paid shall bear a reasonable relation to the costs of production and the earning of a fair return over the costs. [Emphasis added.]
*145 In the opinion of the Solicitor General, the promulgation of this national policy was “an authoritative statement of the policy of the Executive, to be applied by the executive agencies of the Government to the full extent of their legal powers.”[2] (Emphasis added.)
Plaintiff, a mine operator in the “Tri-State District” (Missouri, Oklahoma and Kansas) alleges that the Premium Price Quota Committee, which administered the Premium Price Plan {infra) failed to implement the national policy in that the premium prices paid plaintiff were unrealistic, and did not provide a “fair return” over costs.
Pursuant to the Emergency Price Control Act of January 30,1942, 56 Stat. 23, 50 U.S.C. App. § 902, the Premium Price Plan for lead and zinc had been put into effect as of February 1, 1942, more than a full year prior to the promulgation of the national policy. The Premium Price Plan provided for the payment of premium prices for over-quota production of copper, lead and zinc. Kegulations under which individual mine quotas were established are set forth in Finding 16. The Premium Price Quota Committee was set up to administer the program.
In early 1943 the Committee determined that a 55-cent per rock-ton profit margin for mines located in the “TriState District” was fair. Plaintiff contested this determination but allegedly “relying on the representations of the President’s published order,” continued operations. In mid-1944 the Premium Price Quota Committee raised plaintiff’s premium payments, but did so only prospectively. Plaintiff now complains that the committee’s action in failing to raise plaintiff’s premium payments either at an earlier date or retroactively, constituted arbitrary and capricious action, which was both illegal and inequitable, and a direct violation of the announced national policy which was binding on the committee and which mandated premiums sufficient to guarantee plaintiff a “fair return.”
Before approaching the merits of this case, it might be best to discuss two points raised by defendant. First, we are told that the claim is time-barred since it was referred to *146 us more than sis years after the claim accrued. 28 U.S.C. § 2501. But this is a Congressional Reference case referred to us by the Senate (and filed prior to the decision in (Glidden v. Zdanoh, 370 U.S.C. 530 (1962), which raises doubts about the constitutionality of 28 U.S.C. § 1492), and while the statute of limitations bars any legal recovery in this court, we are not barred from forwarding a recommendation on the merits of the claim to Congress. Ann Arbor Construction Co. v. United States, 130 Ct. Cl. 244, 126 F. Supp. 161 (1954); Zadeh v. United States, 124 Ct. Cl. 650, 111 F. Supp. 248 (1953).
Second, defendant argues that exclusive jurisdiction to entertain this claim resided in the Emergency Court of Appeals. But while the Emergency Court of Appeals did have “exclusive jurisdiction to determine the validity of any regulation or order issued under Section 2 * * *” of the Emergency Price Control Act, plaintiff is alleging a claim against the United States founded upon the violation of a binding Executive Department statement of national policy. While this court may have had jurisdiction over such a claim under 28 U.S.C. § 1491 (3), claims founded on “any regulation of an executive department,” or 28 U.S.C. § 1491 (4), claims founded upon “any * * * implied contract with the United States,” we need only point out once again that this case is now here before us pursuant to a Senate referral resolution.
The questions now awaiting resolution are: first, was the promulgation of this national policy an executive act manda-. torily binding on the executive branch of our Government? and second, if it were binding, did the Quota Committee fail to carry out the mandate in determining the premium prices here involved ?
We have often held, in a multitude of circumstances, that executive regulations promulgated under proper authority ' may have the force and effect of law, and are binding at least on the issuing authority and its components. Cf. Service v. Dulles, 354 U.S. 363 (1957); Barnes v. United States, 163 Ct. Cl. 321 (1963); Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380 (1947). Newman v. United States, 143 Ct. Cl. 784 (1958).
*147 But was this statement of national policy the enunciation -or promulgation of a regulation ? As we have already noted, the Solicitor General’s office concluded that the pronouncement was binding upon the executive agencies “to the full extent of their legal powers.” From the face of their pronouncement it is apparent that the success of the policy could only be achieved by encouraging the operation of marginal mines. This Could only be brought about by the assurance that a “fair return” could be earned by mine operators such as plaintiff. The assurance of that “fair return” was given. We think, therefore, that the Quota Committee was bound to set premium prices that would allow a “fair return.” This conclusion is not contra to our holding in either Victoria Mines, Inc. v. United States, 130 Ct. Cl. 277, 126 F. Supp. 205 (1954), or De Soto Lead and Zinc Company v. United States, 146 Ct. Cl. 640 (1959).
In Victoria Mines, supra, we were asked to construe Section 17(a) of the Contract Settlement Act of 1944 which provided for the payment of “fair compensation” to any person who “* * * arranged to furnish or furnished to a contracting agency or to a war contractor any materials, services, or facilities related to the prosecution of the war without a formal contract * * *.” We held that plaintiff there had failed to prove that any facilities had been furnished to defendant. We further held that Victoria Mines had conducted its activities in reliance on the formal quotas and premiums established under the Premium Price Plan, and not on the Contract Settlement Act. Neither the statement of national policy nor the fairness of set premiums under the Premium Price Plan were at issue.
In De Soto Lead and Zinc Co., supra, the Premium Price Plan was involved. There the issue was the assignment of quotas by the Quota Committee and the failure of the committee to revise the quotas. We held that since plaintiff there did not protest the assigned quota; had made no application for revision of the quota; had failed to file several .monthly reports which may have provided the committee basis for revision of the quota (such reports being required by regulations), and had evidenced in the reports that were .filed a profitable operation, it had failed to state either a legal *148 or an equitable claim against the United States. We further held that any operating losses that De Soto may have suffered were due to poor management and inadequate financing..
We must now determine whether the Quota Committee’s-failure to increase plaintiff’s premiums after the promulgation of the national policy violated the express provisions of that policy statement. Or did the premium prices paid plaintiff actually reflect “* * * a reasonable relation to the costs-of production and the earning of a fair return over the costs-of each separate producer?” [Emphasis added.]
With the advantage of hind sight we can readily see that the premiums paid plaintiff during the period here at issue were “* * * reasonably related” to costs and profit. It is clear from the record that in the two years here in question-plaintiff earned an aggregate net profit of $52,955.18, not-taking depletion into account. Considering depletion, plaintiff’s net profit figure was $7,002.11. Yet, 1943 was the first, full year of operation and generally mines earn no profit during the first year due to greater costs. This factor is graphically illustrated by merely noting capital expenditures. (In 1943, $34,127.15; in 1944, $19,615.90; in 1945, none). In fact during five years of operation beginning with 1943, plaintiff fully repaid principal and interest on a $125,000 BFC loan; made capital expenditures of $91,731.89 and distributed $105,-000 in dividends to its two stockholders. Of this, $321,731.89’ sum, $113,743.05 was expended during the years here involved, even though these first years of operation were the most difficult and costly.
But we are called upon to determine whether the Quota Committee violated the national policy when it established quota and premium price figures for plaintiff’s mine, and whether it erred in failing to retroactively raise quotas and premiums when actual figures were furnished.
The position of the Quota Committee was probably best enunciated by Landon F. Strobel, then its Executive Secretary, in a letter of January 2,1946 to Judge John C. Collet, Stabilization Administrator, from which we will quote at length since it is an authoritative statement of the Committee’s policy. The letter, which is set out in full in Finding 41, explained:
*149 The Premium Price Plan for Copper, Lead and Zinc, which provided for differential pricing on a mine by mine basis, was announced in February 1942, and became effective as of the first of that month. By the summer of that year, it had become a regular practice to adjust ‘production quotas applicable to future prod/action where it appeared that such production would not otherwise be possible on a reasonable financial basis. In other words, it was customary to adjust by means of a quota revision the price paid for production from a particular mine to a figure which was considered to be adequate to permit future mining operations on a reasonable operating margin. In setting such a price for future production, it was fully realized because of the uncertainties involved in mining, that it would be inadequate in some cases and excessive in others.
We believe that Mr. Nelson must have had in mind this established practice when he-in April 1943, made the statement set out in his paragraph 5. He was, we think affirming publicly and giving assurance of the continuance of the basic policy of operation under the Premium Price Plan which was that quotas, and thereby premium prices, should be set on a mine by mine basis with a view to meeting the financial requirements of each particular operation. We do not think that Mr. Nelson’s statement went beyond the affirmation that it would be government policy to attempt to fix quotas and prices so as to cover the anticipated costs and a reasonable return for individual mines. Pie did not, we believe, intend to guarantee to each and every mine operator his costs plus a profit. * * *
We consider that the Quota Committee has an obligation to recommend quotas which are calculated to afford a reasonable return. Such recommendations are based on facts which cannot be hnown in advance with certainty and an element of judgment necessarily enters into quota calculations. Subject to these limitations which must be present if the price of mine production is to be set before mining rather than afterwards, the Committee recommends quotas calculated to cover cash costs and amortization of war time investment and to yield reasonable margins. These margins, which have been standardized with the passage of time, cover depletion, depreciation and profit. Almost never does operation under a quota result in the realization of exactly the margin used in the calculation. Often times, the operator will earn a larger return than intended while in other cases his margin will be less and in still others, he may sustain a cash loss.
*150 Where the return under a quota is much above what appears to be adequate, the Committee recommends an adjustment of quota to lower the subsidy paid the operator. Such adjustment is prospective only and there is no renegotiation of the price paid under the former quota. Likewise, the new quota is calculated to yield the full standard margin.
If a quota yields an inadequate as opposed to an excessive return, the Committee, on application, considers the need of a more favorable quota and makes such recommendation if it appears to be warranted. Except in cases involving errors in former calculations or approved retroactive wage increases, such revisions are, as in the case of mines receiving excessive returns, for prospective operation only. However, in order that no applicant will be prejudiced by necessary administrative delay in the calculation and issuance of a revised quota, favorable revisions are, where the facts warrant, made effective as of the first of the month during which the application for revision was received.
It would seem that if it had been intended that no operation should receive less than costs plus the standard margin, all quotas should have been calculated after the event by accountants rather than before production by mining engineers. To figure all quotas prospectively and then to recalculate only those where the margin earned has been less than intended would be even more unsatisfactory than a straight cost-plus system. * * * {Emphasis added.]
To best judge the propriety of the Quota Committee’s actions in setting prospective quotas and premiums for plaintiff’s mine, we must go back in time to 1948. Initially, on the basis of its application, plaintiff was assigned “A” quotas which enabled it to receive premiums for all production.
Through the two years at issue, plaintiff’s entire lead production received premium treatment under a zero quota classification. Its zinc quota fluctuated to some extent, but for half the period it, too, enjoyed a zero classification. The premiums paid for the lead production were computed from the “A” scale throughout the period, though the zinc premium rates fluctuated from “A” to “C.”
The Quota Committee had developed a margin table applicable to mines located in the same Tri-State area. This margin table was the basis of the assignment of quotas for *151 mines in this area. In 1943 and 1944, and indeed throughout the program, the margin realized by plaintiff exceeded, the table margins. In 1943 MacArthur’s margin was 0.58. while the table margin was but 0.54. An even greater difference, seven cents per ton, was realized in 1944.
In view of these factors, we cannot say that the prospective assignment of quotas and premiums was unreasonable- or arbitrary. But plaintiff argues that the eventual increase-in quotas and premiums evidenced their original shortcomings, and hence the increases should have been made to operate retroactively.
It is too short an answer to merely point out that regulations prohibited retroactive increases in a case such as this. More to the point, the subsequent increase in premiums and quotas does not evidence, in and of itself, any incorrectness,, unreasonableness, arbitrariness, or error in the original assignment of quotas. Indeed as we have seen, plaintiff made substantial economic gains in the years at issue. It made a profit, and it strengthened its capitalization.
Consequently, on all the facts and circumstances contained in the record, and upon the findings of the commissioner which we have reviewed, and in which we concur, we conclude that plaintiff has not stated a claim, either legal or equitable, against the United States.
This opinion, together with the findings of fact and ultimate findings of Commissioner Maletz, will be certified to the Congress pursuant to Senate Resolution 382, 85th Congress.
Davis, Judge, took no part in the consideration and decision of this case.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Herbert N. Maletz, and the briefs and argument of counsel, makes findings of fact as follows:
I. On January 7,1957, there was introduced in the Senate of the United States a bill (S. 263) for the relief of the Mac-' Arthur Mining Company, Incorporated, in receivership, the plaintiff in the present action. This bill provided in pertinent part:
*152 Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to the MacArthur Mining Company, Incorporated, a Kansas corporation, in receivership, the sum of $296,681.77, in full satisfaction of the claim of such corporation against the United States for reimbursement for actual losses sustained and a fair margin of profit in performing its commitments with the United States for the production of strategic and critical lead and zinc from marginal mines, which actual losses and loss of a fair profit were occasioned by default in the Government’s promises to save the corporation harmless from loss and assure it a fair margin of profit: * * *
2. On August 20, 1958, the Senate adopted a resolution (S. Kes. 382) reading, as follows:
Resolved, That the bill (S. 263) entitled “A bill for the relief of the MacArthur Mining Company, Incorporated, in receivership,” now pending in the Senate, together with all the accompanying papers, is hereby referred to the Court of Claims; and the court shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States and the amounts, if any, legally or equitably due from the United States to the claimants.[3]
¡3. Plaintiff, MacArthur Mining Company, Inc. (MacArthur) , is, and at all times material herein was, a corporation duly organized and existing under the laws of the State of Kansas, with its principal office at Baxter Springs, Kan *153 sas. The plaintiff now is and, for some years past, has been in receivership pursuant to a duly-entered Order of the United States District Court for the District of Kansas, under which Carl V. Rice, of Kansas City, Kansas, is and, for some years past, has been plaintiff’s receiver.
4. MacArthur was chartered in April 1942 for the purpose of mining lead and zinc in the so-called Tri-State area, which is composed of the corners of Missouri, Kansas and Oklahoma. Its incorporation was effected a few months after Pearl Harbor when the nation’s lead and zinc supplies were dangerously low in relation to the war’s needs.
5. J. W. Hoffman of Joplin, Missouri, was the president of MacArthur from the time of its formation and during all times material to this case. Mr. Hoffman had been engaged in the mining business since 1916.
6. MacArthur’s capital stock consisted of 300 shares of common stock of no par value which were issued in exchange for an assignment by Mr. Hoffman of a mining lease which he had on approximately 75 acres of land located some three or four miles west of Baxter Springs, Kansas. Under the lease arrangement, MacArthur was required to pay to the lease owner a 10% royalty on gross income from production of lead and zinc ores. Previously, the lease owner had spent about $30,000 for drilling the mine.
7. The 300 shares of MacArthur’s authorized stock was issued on April 9, 1942, to the following individuals in the amounts listed below:

Shares

J. W. Hoffman_ 150
Inghram D. Hook (MacArthur’s attorney)_ 149
David W. Rockwell_ 1
8.To start the company in business, Messrs. Hoffman and Hook, MacArthur’s two principal stockholders, had travelled to Washington, D.C., several times. They had also devoted some period of time and effort to find a mining lease that ■could be operated.
¡9. None of MacArthur’s three stockholders invested at any time any money in the business.
10. On or about April 20,1942, MacArthur obtained a loan of $100,000, with interest, from the Reconstruction Finance Corporation (RFC), later increased in December 1942 to *154 $125,000, for purposes of construction and development of the mine involved in the present action. Before the loan was approved, the company, at the RFC’s request, drilled' three or four test holes in the mining area to find out whether the ore extended over the field. The loan, supported by a trust indenture and chattel mortgage, was repaid in full by the end of 1946.
NATIONAL POLICY WITH RESPECT TO WAR METALS AND MINERALS' MINING PROGRAM
,11. On April 17, 1943, acting on the request of the President of the United States, the Chairman of the War Production Board (WPB), in a letter to the President, submitted recommendations with respect to the war metals and minerals-mining program. The letter in full is set forth below.
War Production Board,
Washington, D/J.

April 17,191¡3.

The President
The White House, Washington, D.G.
My Dear Mr. President : On March 11 you asked me to provide you with a complete review of the war metals and minerals mining program, together with suggestions as to the policies to be followed with respect to supplying 1944 needs.
Such a review has been made under the direction of Mr. Howard Young, Chairman of the Minerals and Metals Advisory Committee, in collaboration with Dr. R. S. Dean, Assistant Director of the United States Bureau of Mines, with the assistance of representatives of other interested departments and agencies. Secretary Ickes is in agreement with the policies which have emerged from this review and which are recommended in this letter.
This reply to your letter, based on the review which has been made, is divided into two parts: (1) Recommended general policies, and (2) programs for particular-metals and minerals.

Recommend,ed general policies

As the result of much discussion and investigation within the executive departments and agencies, the Congress and industry itself, it appears that generally recognized national policies are needed on a number of aspects of metals and minerals production. I recommend that the following policies be adopted for the guidance of *155 all departments and agencies concerned and for the information of the public.
1. For strategic and critical minerals, it is national policy to do full, detailed production planning and to make actual investments now, and in the near future, of materials, equipment, and manpower for production through 1944, and through 1946 for certain metals and minerals. It is national policy to carry out exploration and determination of reasonably satisfactory sources of materials with full proving of reserves and detailed plans as to how reserves are to be exploited for production through 1946. It is national policy to have general plans to meet contingencies, if they should develop, for all critical metals and minerals through 1948.
2. It is national policy to get the maximum possible output domestically and also to bring in as much as we can from overseas.
Oomm&wb. — Sharply contrasting views on this subject have been expressed. One view is that imports should be relied upon as much as possible in order to use the return voyages of supply ships and to conserve our own natural resources. The other view is that domestic production should be increased to the maximum.
My position is that these views are not mutually exclusive. Our supply ships necessarily visit many parts of the world. It seems to me plain common sense that they should be used to the utmost on return voyages to bring in materials that we need. I would put this limitation on that policy: That in loading return cargoes, ships should not be directed so far from their regular runs or delayed so much at the turnaround that they become less available as military supply ships.
In other words, I believe our policy should be to get the maximum possible output domestically (consistent with policies in respect to manpower and equipment set forth later) and at the same time to bring in as much as is feasible from overseas.
It is sometimes asserted that we should rely to the utmost on imports and conserve our own natural resources so far as possible in order to provide protection against some future war or to make available more domestic supplies for peacetime use. I disagree with this proposition for the following reasons:
Let us agree that our basic policy must be to devote metals only to essential uses — either for military and essential civilian end products or for maintenance of the productive machinery of the country. In other words, we shall fabricate metals into finished form only to the *156 extent that is essential. Then suppose we accumulate from every source all the supplies we can of the most important metals; and suppose we find ourselves at times with a surplus on our hands. We shall have lost nothing except the use of labor and equipment used in producing the surplus. And these excess supplies of metals will be available to provide protection against future war needs or to insure more domestic supplies for peacetime use. On the other hand, having too little available for essential uses can obviously have most unfortunate results.
In other words, as I size up the risks involved in seeking all we can get versus something short of that, the risks are much less serious under a policy of seeking all we can get.
8. It is national policy to make the fullest possible use of small and marginal ore deposits, subject to these limitations : (1) That the expected return in usable minerals is sufficient to justify the use of critical materials and equipment in present operations or expansion; (2) that the return in usable minerals is sufficient to justify the use of manpower, not only in operation of the mine, but also in the construction of access roads and similar facilitating construction; (3) that such use of resources will not actually interfere with the “must” programs.
4. It is national policy to build up stock piles of strategic and critical metals and minerals to insure us against unforeseen developments whenever we can secure supplies of particular strategic and critical metals and minerals in excess of our ability to use them currently in production for essential uses.
Comments. — Our policies in regard to stock piles in many instances are and must be determined by our fabricating capacity for essential products. Whenever we can fabricate all available raw materials into essential military finished products or products vital to the maintenance of our productive equipment, we should do so and not divert materials from production into stock piles. In general, materials should be directed into immediate production of the most urgently needed end products.
However, in some instances we can secure supplies of particular strategic and critical materials in excess of our ability to use them currently in production for essential uses. In these cases I believe we should endeavor to build up stock piles to insure us against unforseen developments. In so doing we should use domestic production to the fullest possible extent and we should use imports to the maximum. As has already been empha *157 sized, the risks of having too much available are far less than the risks of having too little.
5. It is national policy that labor, materials, transportation, and time to get into production, rather than money cost, are to be considered the controlling factors in deciding whether or not to increase production, but that the price paid shall bear a reasonable relation to the costs of production and the earning of a fair return over the costs of each separate producer.
Comment. — In any particular project output of product per unit of labor, expenditure of materials and equipment per unit of output, availability and reliability of transportation, time required to secure a usable product are all factors of more importance than money cost. To some extent of course, money cost is a shorthand way of expressing manpower and materials requirements, but we should always look primarily at these factors directly; that is, manpower and material requirements.
By using the phrase “money cost” I am seeking to emphasize the fact that in this war money must be regarded as a means to an end, and not as a measure of the value of that end. The ends we have in mind — complete and speedy victory — are to be measured only in terms of the lives of our fighting men and the security of the Nation.
But I also must make clear that so far as price to any particular producer is concerned, it is a governing principle that the price paid 'bears a reasonable relation to the costs of production and the earning of a fair return over the costs of each separate producer.
6. It is national policy that metals and minerals production shall have high preference in the allocation of equipment and manpower.
Comment. — Our problem is one of balancing a great variety of competing important needs — with the objective of getting the largest possible output which we can use to get an impact against the enemy or to maintain our minimum essential civilian economy.
Within this broad limitation, however, I believe our policy should be to assign a very high preference so far as manpower goes to the relatively small needs of domestic mining. We should make even more aggressive efforts to provide labor, by recruiting and training and perhaps temporary military furloughs, for existing mines and for new projects. So long as existing equipment in operating mines is not fully manned, it is shortsighted to draw more labor from these existing operat *158 ing mines for use in new projects. But we must not regard the supply of miners as fixed — we must find ways to provide adequate working forces not only for operating mines but also for new projects. In this sense, mining should have high preference in our efforts to resolve the manpower problem.
With respect to equipment, our first policy should be to use all existing idle mine facilities and equipment for the production of critical minerals, either in their present locations or elsewhere. So far as new equipment goes, our policy, I believe, should be to provide it when the return in critically needed minerals is substantial, subject to the needs of the so-called must programs. In other words, if a particular component such as a compressor is needed for a new mining project and for our current escort-vessel program, I believe the mining project should be deferred. Very often it will develop that the mining project can go ahead with improvised equipment, providing low-dollar cost is not insisted upon by the Government. In my judgment, whenever producers improvise methods which get production without critically short types of equipment at higher cost, the Government should freely pay this higher cost and spread the knowledge of the method.
To summarize, critical metals are of vital importance and require aggressive efforts to increase the available supply. Wherever this can be done without detracting from our immediate impact against the enemy, our policy should be to give strong preference to mining in providing manpower and equipment.
Along with this policy, I believe we should continue strongly to emphasize the policy of exerting continuous pressure to conserve and limit our use of critical metals and to develop substitutes for them.

Review of programs

For your information I am attaching, as Appendix A, a tabulation showing for each of 87 strategic and critical minerals and metals the supply available in 1941 and 1942 and the estimated supply for 1943 and 1944, according to our present programs. Back of these summary figures there are available detailed estimates showing the anticipated production from each mine now in operation, the anticipated production from new mines whose operation is contemplated, and the equipment and manpower requirements for each such project. These detailed figures are available for your consideration if you should desire them.
*159 In connection with, new projects, I should like to transmit to you the criteria for selection of new projects worked out jointly by the War Production Board and the Bureau of Mines.

Criteria For Selection Of Mining Projects

(a) Need for the product. — Will not only be confined to immediate needs, but will consider anticipated shortages and the advantages of increased supply.
(b) Ore supply. — Reserves should be reasonably well indicated by sampling and adequate prospecting.
(c) Treatment method. — There should be reasonable proof that the ore is amenable to beneficiation.
(d) Time. — Preference will be given to properties that will come into production soon, but if anticipated needs warrant it, long-range projects will be started.
(e) Facilities. — Preference will be given projects that can use existing equipment.
(f) Mempower. — Other things being equal, preference will be given to projects so situated that they can use non-transferable labor, not presently engaged in mining.
(g) Management. — Must be responsible. If there is any question as to the reliability of the proposed management, but no other is available, close supervision will be provided by the appropriate Government agency.
(h) Transportation. — Preference will be given projects close to markets.
In this connection, I wish to emphasize that a serious problem arises when requirements are computed on the basis of present supplies of metals and minerals rather than upon future needs for end products. The task is to bring supplies up to the level of anticipated needs. I believe the policy, set forth in the first section, of maximizing supplies of strategic and critical minerals and metals will meet this situation so long as we take care to avoid infringing upon the current requirements of the “must.” programs for equipment and materials.
In connection with the summaries of estimated supplies for 1948 and 1944 I should like to emphasize that the programs for production of strategic and critical minerals and metals are constantly under review and that I am confident that in many instances it will prove possible to increase production in accord with the policies set forth above.
Respectfully yours,
DoNald M. NelsoN, Ohairma/n.
*160 12. (a) On April 24,1943, the President, in the following letter to Senator James E. Murray, approved the recommendations of the Chairman of the WPB for a national policy with respect to the war metals and minerals mining program, and made those recommendations public:
The White House,
'Washington, April B4-, 191$.
Hon. James E. Murray,
United, States Senate,

Washington, D.G.

My Dear Jim : This is in further reply to your letter of February 19, raising questions concerning our national policy with respect to the production of strategic and critical metals and minerals. Mr. Donald M. Nelson, Chairman of the War Production Board, has submitted the policies set forth in the letter attached with the recommendation that I approve them and make them public. I do approve these policies, and I am making them public in this letter to you.
Very sincerely,
Franklin D. Boosevelt.
(b) On September 7, 1945, Harold Judson, Assistant Solicitor General of the United States, wrote Sep ator Arthur Capper that the President’s letter adopting and promulgating the Nelson letter “must be considered as an authoritative statement of the policy of the Executive, to be applied by the executive agencies of the Government to the full extent of their legal powers.” Mr. Judson’s letter is quoted in full below.

September 7,191$.

Honorable Arthur Capper,
United States Senate,
Washington, D.G.
My Dear SeNAtor Capper : As the Attorney General advised you in his letter of August 25, he has referred to me the question you raised in your letter of August 21, with respect to strategic metals.
I have carefully considered the letter which Mr. Donald M. Nelson addressed to President Boosevelt under date of April 17, 1943, and the letter from President Boosevelt to Senator Murray dated April 24,1943, I have also considered the Act of June 7,1939 (53 Stat. 811), relative to the acquisition and development of strategic materials, and the Beconstruction Finance *161 Corporation Act (47 Stat. 5) as amended by the Act of June 10,1941 (55 Stat. 248).
It seems to me that President Koosevelt’s letter, adopting and promulgating Mr. Nelson’s letter of April 17, 1943, must be considered as an authoritative statement of the policy of the Executive, to be applied by the executive agencies of the Government to the full extent of their legal powers.
If you are interested in the application of this policy to a particular group of problems, please let me know, and I will render whatever assistance I can.
Sincerely yours,
/S/ Harold JudsoN,

Assistant Solicitor General.

THE premium; PRICE PLAN FOR COPPER, LEAD, AND ZINC
13. Effective February 1, 1942 and continuing until June 30, 1947, there was in operation what was known as the Premium Price Plan for copper, lead, and zinc. This plan was authorized and administered under the Emergency Price Control Act of January 30, 1942, which contained a declaration of policy to stabilize prices and wages.
Under the administration of this plan, ceiling prices were maintained, but in order to stimulate the maximum necessary production for wartime needs under price-control conditions, premium payments were made on excess production over normal 1941 production (referred to as the “quota” basic production) and on production from new mines and marginal producers.
(14. Following the outbreak of war in December 1941, the Office of Price Administration (OPA) developed a multi-price system for copper, lead and zinc, which was agreed upon with the Office of Production Management (OPM), the KFO, and the Supply, Priorities and Allocation Board. Ceiling prices were established by the OPA at 12 cents per pound for copper, 6.5 cents per pound for lead, and 8.25 cents per pound for zinc. The maximum differential of 2.75 cents per pound for lead and zinc and 5 cents per pound for copper were decided upon as additions to the ceiling price as subsidies on all production above quotas calculated on the basis of 1941 production.
15. On January 12, 1942, Jesse H. Jones, Federal Loan *162 Administrator, wrote OPM and OPA that the Metals Be-serve Company [4] (MBC) of the BFC would pay 17 cents a pound for copper, 9.25 cents for lead, and 11 cents for zinc for a period of 2% years from February 1, 1942, for production above the 1941 quotas to be fixed with the approval of the BFC.
16. On February 9, 1942, a joint statement, known as the Premium Price Plan, was issued by the WPB and the OPA setting forth the rules and regulations by which domestic mine operators might obtain premium prices for overquota production of copper, lead and zinc. The plan provided that initial quotas would be fixed by a joint committee from WPB and OPA and that premiums would apply to all over-quota production from February 1,1942, regardless of when tonnage quotas were determined and announced, at rates of 5 cents per pound for copper and 2.75 cents per pound for lead and zinc over existing OPA prices.
The regulations provided that quotas would be established for particular mines or group of mines referred to as a “property” and expressed in terms of a monthly rate of production. Such quotas were to be established under five distinct classifications, as follows:
(a) Zero quotas would be assigned for any property having no production during 1941 or production of 200 tons or less of any metal, except as provided under (e) below. Thus, the full production from such mines would be generally entitled to the premium payments.
(b) Quotas between zero and 100 percent, except as provided in (e) below, would be established for mines that produced more than 200 tons but less than 600 tons of any metal during 1941, and such quota would be established by deducting 200 tons from the 1941 production and multiplying the remainder by 1.5. For example, a mine that produced 400 tons in 1941 would, have a quota of 300 tons with a monthly rate of 25 tons (400 minus200 times 1.5).
*163 (c) One hundred percent quotas would apply to mines which during 1941 had produced 600 tons or more of any metal for which the assignment was determined, except as provided in (d) and (e) below. The 1941 rate of production was determinable upon the average weekly rate of actual production times 52 weeks. The rate of production would be the same as actual production except where a mine had operated less than 52 weeks during 1941. Thus, a mine of this type would be entitled to premium pay only on the increase of its production of any metal over its 1941 production of that metal.
(d) Special quotas of less than 100 percent of 1941 production might be assigned in special cases.
(e) Special quotas in excess of 100 percent of 1941 production would be assigned in certain cases, based upon the determination of tonages that could be reasonably expected to be produced at the established OPA rates, and for mines that were not operated during 1941, but where plans were under way to provide for their operation.
In each instance where a production quota was established, the monthly rate was determinable by dividing the amount by 12. When any mine failed to maintain its monthly quota, its production deficit would have to be made up before premium payments would be made on overquota production in later months. Of course, this would not apply for mines assigned a zero quota. If conditions developed that made it impossible to maintain the quota assignment, consideration would be given to applications for reductions of the quotas. But all initial quotas, once established, would not be raised during the period of the operation of the plan.
The production of a mine or property was based upon the recoverable metal contents of the materials or concentrates produced.
17. On March 7, 1942, MRC issued a statement of its functions under the Premium Price Plan and method of payment to producers. It reported that various smelting companies throughout the United States had been' designated as agents for MRC to obtain and transmit the necessary data required for making premium payments. MRC required that a sworn statement must be furnished by each *164 producer showing the amount of material in excess of quota delivered during the month on which he was eligible for a premium payment, and caused the smelting company to be furnished with all necessary information to enable it to supply the MEC the data required for making premium payments. Upon the receipt of such data from its agents and representatives, together with the sworn statement of the producer, the MEC would promptly arrange for the premium payments.
■18. Effective May 1, 1942, the WPB established the Premium Price Quota Committee (hereafter referred to as the “Quota Committee”) to administer the plan, subject to the concurrence of MEC. This committee consisted of six members and was composed of one representative each from the Copper Branch, Tin-Lead Branch, and the Zinc Branch of the Materials Division of the WPB, with an equal number from the corresponding organizational units of OPA. The duty of the Quota Committee was to establish and assign production quotas to copper, lead and zinc producers, and to promulgate rules and regulations and other appropriate measures to effectuate its work.
19. On March 5,1943, the MEC, acting on a recommendation of the WPB and OPA, approved a program for additional premium payments for lead and zinc in cases where such premium payments were considered essential to insure maximum necessary mine production. Under the program, the basic quota was denominated an “A” quota. In addition to the “A” quota, the Quota Committee was authorized to assign “B” quotas for lead and zinc upon which the MEC would pay an additional 2.75 cents per pound for excess production, and to assign “C” quotas for zinc only, upon which MEC would pay a second additional 2.75 cents per pound for excess production over such quota assignments.
To illustrate, it is assumed that a mine had a basic quota of 2,000 tons a year and was assigned a “B” quota of 3,000 tons and a “C” quota of 5,000 tons. The position of this mine, in the event it produced a total of 6,000 tons of zinc, was, as follows:
1. First 2,000 tons paid for at 8.25 cents — no premium.
2. Next 1,000 tons paid for at 8.25 cents, plus premium under “A” quota of 2.75 cents.
*165 3. Next 2,000 tons paid for at 8.25 cents, plus premiums under “A” and “B” quotas of 5.50 cents.
4. Next 1,000 tons paid for at 8.25 cents, plus premiums under “A”, “B” and “C” quotas of 8.25 cents.
The “B” and “C” quotas on which additional premiums were based could be increased at any time (which would reduce the production on which premiums would be paid), or they could be revoked entirely upon 30 days’ notice. Initial quotas as well as any downward revision of quota assignments (to increase the production for premium pay), were made only upon application of the producer, and the effective date of the assignment, or revision of the quota, was the first day of the month in which the application was made.
Monthly deliveries below the respective quotas for each metal had to be made up in the succeeding months before the producer could receive the premium payments on production in excess of such quotas.
20. Premiums for mines in the Tri-State area, where MacArthur was located, were paid on a per-ton basis of 60% zinc concentrates and 80% lead concentrates. While the ceiling prices for copper, lead and zinc were still in effect, the following premiums were available:

21. On June 3, 1946, the ceiling price for lead was-ih-creased 1.75 cents from 6.5 to 8.25 cents per pound, and copper was increased 2.375 cents per pound from 12 to 14.375 cents, and the premium payments on “A” quotas were reduced accordingly, lead being reduced from 2.75 to 1 cent a pound and copper from 5 cents to 2.625 cents per pound on ¥A” quotas.
On October 14, 1946, the OPA ceiling price ón zinc was increased from 8.25 cents to 9.25 cents a pound and the premium payments on “A” quotas were reduced accordingly.
*166 22. Effective November 1, 1946, when ceiling prices on copper, lead and zinc were removed, all premium assignments were reissued with the then existing quotas translated into the “market price-plus-premium” type of assignment. Any tonnage quotas existing against the old quota assignments remained with the new assignments.
23. The Quota Committee established the following administrative principles in its operation of the Premium Price Plan:
. 1. Quota revisions are calculated to provide the financial basis for future production only.
2. Downward quota revisions (increased rate of premium payments) are based pi’imarily on forecasts of operations.
3. Quota revisions for forward production shall not include allowance for the reimbursement of past losses.
4. Recommendations for upward revision of quota (decreased rate of premium payment) are made at the discretion of the Quota 'Committee when operating reports are in default or when it appears that excessive premiums are being or will be paid.
5. Downward revisions of quota are made only at the request of the applicant.
6. An applicant may submit at any time:
(a) A request for quota revision either upward or downward.
(b) A new forecast for forward operations.
. 7. Except as noted under the provision for retroactive quotas, under 8 below, the effective date of a quota revision may not be earlier than the first of the month during which the request is received, and may be later if warranted by the facts such as an improvement in earnings or other reason.
8. Quotas may not be made retroactive beyond the first of the month during which the application is received, except to provide for:
(a) Increased payments to compensate for wage adjustments approved by the Director of Economic Stabilization in cases where past operating margins for the period covered by the wage increase have been inadequate to absorb the increased wage costs, and
(b) Rectification of an error in calculation made by the Quota Committee.
*167 9. Premiums to include allowances for exorbitant royalties are not recommended by tbe Quota Committee.
10. An amortization rate for wartime capital investment made during tbe period January 1, 1942 to April 14, 1945, and for approved expenditures made after April 14,1945 is considered as a cost item in determining quotas.
11. In amortizing wartime capital investment, consideration is given to tbe extent to which past margins in excess of an adequate operating margin have permitted tbe recovery of such investment.
12. In instances where tbe War Production Board has requested that tbe operator maintain production at the highest possible level without regard to proper balance between development and production, normal development cost is considered in the calculation of quotas, whether or not this money can be spent currently for the purpose provided.
13. The lump sum allowed for operating margin in the calculation of quotas is intended to include all corporate allocations such as depreciation, depletion, other reserves, dividends, retirements to surplus, etc.
14. In determining operating margins, basic margins are increased by 50% for operators owning the mines, by varying amounts for operators owning mills, and by varying amounts for small mines.
15. Operators paying royalties which apply on purchase prices are considered as owners in the calculation of operating margins, and such royalties are not considered as costs.
16. In the calculation of quotas, higher operating margins per pound of metal are reckoned for those mines which produce metal at lower costs per pound.
i24. The Quota Committee prescribed forms which were to be utilized by the producer under which it made application for, and revision of, quota assignments and premium payments. The data required in these forms specified the location of the mine; the type and grade of its ore deposits; the extent of reserves; mining methods used; anticipated production ; operating costs; capital expenditures; whether the mine was owned or being leased on a royalty basis; and the previous operating history of the mine, if any, covering its production-cost-revenue record.
After receipt and consideration of the data submitted on the mine operator’s past history and anticipated operating *168 costs, the Quota Committee compiled a forecast of the operator’s anticipated production-cost-revenue schedule and then assigned quotas.
In determining the suitable quota and premium rate, the Quota Committee made an allowance for a “margin” to compensate producers for taxes, depreciation, depletion, interest on capital investments, and other indirect costs, and profit. The Quota Committee arrived at the “margin” by a formula developed for copper-lead-zinc mines and was an addition to the more direct operating costs. This formula for “margin” applied by the Quota Committee was based upon information derived from financial records of many representative mines previous to 1942. The basic margin factor was adjusted for small mine operators to allow the greatest margin factor to the smallest operator.
macarthuk’s operations under the premium; price plan
25. Beginning in or about January 1943 and continuing to June 30, 1947, when the Premium Price Plan was discontinued, MacArthur received premium payments for lead and zinc.
Initially the company was assigned, on the basis of its application, an “A” quota since it was not in production in 1941. Under this quota, which was not subject to change, MacArthur was entitled to and received premium payments for all production until June 30, 1947, when the Premium Price Plan ended.
2S. (a.) A memorandum dated July 9,1947, prepared by a member of the Office of Premium Price Plan, Division of Liquidation, Department of Commerce, shows that during 1943 and 1944 (the two years involved in this case) MacArthur operated its mine under an “A-0” quota for its lead production and variations of “B” and “C” quotas for zinc, as shown below:
1/1/43 to 5/1/43.-. ZnS B-0. PbS A-0
5/1/43 to 9/1/43— ZnS C-25_ PbS A-0
9/1/43 to 12/1/43- ZnS C-0_ PbS A-0
12/1/43 to 3/1/44- ZnS C-200_ PbS A-0 (Initial A-0-0)
3/1/44 to 7/1/44-_ ZnSA-350_ PbS A-0
7/1/44 to 12/1/44- ZnS C-0_ PbS A-0 Maximum ZnS
*169 (b)This memorandum also showed that under the Premium Price Plan the margins which MacArthur earned exceeded those provided by the Quota Committee’s table of margins,[5] as indicated by the following:

(c) For 1943, MacArthur realized a margin of 58 cents per ton as compared to 54 cents a ton allowed by the table. In 1944, it realized a margin of 55 cents a ton, as compared to the table margin of 48 cents.
(d) From the start of its operations in 1943 to October 1, 1946, MacArthur received margins which were $158,159.00 in excess of allowable table margins.
27. For the years 1943 to 1947, inclusive, MacArthur received the following premium payments and income from sales:

28. For the years 1943 to 1947, inclusive, MacArthur’s net operating profit (net operating income minus operating expenses) and its net income or net profit before Federal taxes (net operating income minus other expenses) were, as follows:[6]

*170

29. (a) For the years 1943 to 1947, inclusive, MacArthur’s books reflected tbe following for depletion:

Tear Depletion

1943_$25,899. 33
1944_ 20,053.76
1945_ 30,642.80
1946_ None
1947_ None
Total_ 76, 595. 89
(b) MacArthur’s charge of $25,899.33 for depletion in 1943 was based on estimated ore reserves of 162,542 tons. Its charge of $20,053.76 for depletion in 1944 was based on estimate ore reserves of 235,842 tons.
(c) For the years 1943 to 1947, inclusive, MacArthur’s net profit before Federal taxes, after deducting the foregoing amounts for depletion, was, as follows:

Net income or net profit before Federal

Tear taxes

1943_ ($24,730. 71)
1944_ 31,732.80
1945_ 31,163.45
1946_ 172,636. 58
1947_ i (7,637.18)
Total_ 203,164.94
1 Loss.
30. During the period 1943-1947, inclusive, MacArthur’s ore production, metal production, and operating profit per ton milled and per ton metal produced were, as follows:

*171

31. (a) For the years 1943 to 1947, inclusive, MacArthur’s net profit before Federal taxes per ton milled was, as follows:

(b) From January 1, 1943 to December 31, 1944, MacArthur produced a total of 223,069 tons of ore. See finding 30. In those two years its aggregate net profit, before Federal taxes and not taking depletion into account, was $52,-955.18. See finding 28. On this basis, the company had a net profit of approximately $0,237 per ton of ore produced. Taking depletion into account, MacArthur’s aggregate net profit before Federal taxes for 1943 and 1944 was $7,002.19. See finding 29 (c). On this basis the company had for 1943 and 1944 an aggregate net profit of about $0,031 per ton of ore produced.
32. During the period 1943-1947, inclusive, MacArthur’s profits were sufficient to enable it to repay fully the principal and interest on the $125,000 RFC loan which it had obtained to work the mine; to make capital expenditures of $91,731.89; and to pay dividends of $105,000 to its two stockholders, Messrs. Hoffman and Hook. More particularly, in these years MacArthur made the following dividend payments, RFC loan repayments and capital expenditures:

*172

33.(a) Under the provisions of the RFC’s loan agreement with MacArthur in 1942, that agency’s representatives maintained a close check on the company’s mine operations during the life of the loan. Mr. Hoffman, the company’s president and one of its two principal stockholders, was for the first nine months of the company’s operations in 1943 limited by RFC to a salary of $50.00 per week, which was later increased to $60.00 and then to $75.00 per week. Beginning in 1945, Mr. Hoffman’s salary was, with RFC approval, raised to $400.00 per month.
(b) Mr. Hook, MacArthur’s other principal stockholder and also counsel for the company since its creation, received from MacArthur $692.16 for legal fees and expenses in 1943, and $1,450.95 for legal fees and expenses in 1944.
(c) During the time that it was under the supervision of the RFC from early 1943 to 1946, when the loan of $125,-000, with interest, was retired, MacArthur paid no dividends to its stockholders. In 1946, as soon as the loan was retired, MacArthur paid its two stockholders dividends of $60,000. See finding 32.
EVENTS LEADING TO PRESENT CONTROVERSY
34. In April 1943, the written recommendations of April 17, 1943, from the Chairman of the WPB to the President regarding a national policy with respect to the war metals and minerals mining program (see finding 11) and the President’s letter of April 24, 1943, approving such recommendations (see finding 12) were brought to the attention of Mr. Hoffman, the president of MacArthur.
35. (a) By April 1943, MacArthur, which had for all practical purposes begun production of lead and zinc about January 1,1943, encountered various difficulties in operating *173 the mine. Among other things, it found a considerable amount of water in the mine and had difficulty in obtaining a suitable labor force.
(b) The record fails to sustain the company’s contention that in April 1943, when it was assertedly faced with cessation of operations “on account of unavoidable operating losses due, primarily, to insufficient premium payments from defendant * * it continued operations in reliance on the President’s letter of April 24,1943.
(c) Nor does the record sustain MacArthur’s contention that in April 1943 it was concerned with “unavoidable operating losses due, primarily, to insufficient premium payments”.
(d) Mr. Hoffman’s testimony that MacArthur continued in operation in April 1943 in reliance on the President’s letter of April 24, 1943, lacks corroboration and is not supported by the record.
(e) The evidence of record establishes that in April 1943 MacArthur was not dissatisfied with its profit position. Thus on June 30, 1943, Mr. Hoffman wrote to the RFC that MacArthur’s “operations in April showed a profit of something over $6,000. * * *” The company’s books, moreover, reflected a net profit per rock ton mined in January, Febru-uary, March and April 1943, in the amounts of $2.3808, .6807, .4013, and .4933, respectively, before depreciation and depletion.
Further, in April 1943 the company had been participating in the Premium Price Plan only three months and was then receiving premiums for all production (based on an A-0 quota for lead and a B-0 quota for zinc) and was allowed a margin in excess of that provided by the Quota Committee’s table margin formula. See findings 26 (a) and (b). Apart from that, it is generally the case that a mine earns no profit during the first year of its operation, since costs are usually greater in that period.
36. In 1943 and 1944, MacArthur complained frequently— orally and in writing — to defendant’s duly authorized representatives, including the Premium Price Quota Committee, that the quotas assigned to it for its lead and zinc production completely failed to provide it a fair margin of profit for *174 the two years in question, 1943 and 1944. The company contended that this was in violation of the President’s letter of April 24, 1943.
37. MacArthur sought a revision of its 1943 and 1944 quotas primarily on the contention that it was entitled to an increase in the amortization rate. In support of its position, the company relied in late December 1943 on a revised tonnage report prepared by William M. Stewart, a mining engineer it had engaged. Mr. Stewart in the revised report estimated the ore reserves at 106,000 tons and recommended that the capital amortization rate used in calculating MacArthur’s quotas be increased so that the amortization would be complete when the 106,000 tons had been extracted. Mr. Stewart had previously, as of January 1,1943, estimated MacArthur’s ore reserves at about 316,000 tons.
In applying for the EFC loan in 1942, MacArthur had, on the basis of an earlier survey by Mr. Stewart, reported 305,000 tons as its ore reserves. This figure of 305,000 tons was the one used by the Quota Committee in arriving at a rate of capital amortization for quota and premium purposes. By the end of June 1947, MacArthur had actually mined 626,478 tons of ore (see finding 30), and thus received an allowance for amortization under the Premium Price Plan of over twice its actual amortization.
38. (a) On December 24, 1943, Mr. Hoffman wrote to Jesse L. Maury, Director, Metal Analysis, OPA, and a member of the Quota Committee, enclosing the revised tonnage report prepared by Mr. Stewart in which Mr. Stewart recommended an increase in the amortization rate on the basis of estimated ore reserves of 106,000 tons. Mr. Hoffman’s letter to Mr. Maury read, in pertinent part:
I am enclosing herewith revised tonnage report on the MacArthur Mining Company, prepared by Mr. William Stewart, engineer. From this statement it would seem to me that a greater allowance should be made for amortization than has been made heretofore, and also from this tonnage report it would mean that an allowance of $1.00 per ton at least should be allowed to repay the EFC loan during the life of the present development.
I am pleased to advise you that our hopper and derrick are practically complete and we expect to commence *175 hoisting dirt the first week in January — weather permitting. From our costs records up to date, my statement to you when in Washington of the necessity of a C-zero quota for November and December has been proven to be correct, and I am still in hopes that you will see your way clear to help me out on this matter.
(b) On December BO, 1943, Mr. Maury replied to Mr. Hoffman, as follows:
I have received the report by Mr. Wm. Stewart on the MacArthur property. Thank you for forwarding it. Congratulations on getting the hopper and derrick for operation. I hope that you may have every success in attaining maximum production. I think that it would be well to wait until your cost and revenue situation is stabilized at full production before considering the matters in Mr. Stewart’s report.
With the season’s best greetings,
(c) As required by its rules, all official mail of the Quota Committee was sent out over the signature of the Committee’s Executive Secretary.
39. Effective July 1, 1944, the Quota Committee revised MacArthur’s “C” quota from 350 to zero, which was the maximum quota for zinc production. See finding 26 (a).
40. In or about December 1945, MacArthur took the claim involved here to the Government’s Stabilization Administrator, John C. Collet, and requested reconsideration of the quotas assigned to it by the Quota Committee in 1943 and 1944. On December 4,1945, Judge Collet addressed the following letter to the Quota Committee:
Office op Stabilization AlDministeatob,

December 4, 191¡5.

Quota Committee,
Premium Price Plan for Copper, Lead and Zinc,

Civilian Production Administration,

lpfrh and Independence Av., /S'.TP.,

Washington, D.O.

GeNTLemept: This opinion is concerned with the request of the MacArthur Mining Company, Inc., Baxter Springs, Kansas, for reconsideration of certain quotas assigned it by your Committee in 1943 and 1944.
In March 1943, the President requested Mr. Donald Nelson, the then Chairman of W.P.B., to provide him with a complete review of the war metals and minerals *176 mining program, together with suggestions as to policies to be followed with respect to supplying 1944 needs. That review and those suggestions were made, were approved by the President and made public on April 24, 1943. The pertinent portion of the approved suggestions as to prices are, in part, as follows:
Recommended general policies:
1. For strategic and critical minerals, it is national policy to do full, detailed production planning and to make actual investments now, and in the near future, of minerals, equipment, and manpower for production through 1944, and through 1946 for certain metals and minerals.
* £ ifc ‡ *
2. It is national policy to get the maximum possible output domestically and also to bring in as much as we can from overseas.
* * * # *
3. It is national policy to make the fullest possible use of small and marginal ore deposits, subject to these limitations: (not material for present purposes.)
s}i * # * s£
4. It is national policy that labor, materials, transportation, and time to get into production, rather than money cost, are to be considered the controlling factors in deciding whether or not to increase production, but that the price paid shall bear a reasonable relation to the costs of production and the earning of a fair return over the costs of each separate producer.
January 12, 1942, Mr. Jesse H. Jones, as Administrator of the Federal Loan Agency, had announced that in order to stimulate the production of zinc, lead and copper, a higher price for those metals would be paid under a plan and quota to be announced by the Price Administrator.
March 7, 1942, the Metals Reserve Company announced that a program of premium payments to be paid on quota established by the W.P.B., the O.P.A., and approved by the Metals Reserve Company.
April 1, 1943, the O.P.A. announced the Premium Price Plan for the payment of royalties on copper, lead and zinc ores. In that announcement it was stated:
The purpose of the Premium Price Plan is to make possible for producers to mine ore which are *177 sub-marginal at the ceiling prices for copper, lead and zinc either because of the low grade of the ores or the high costs entailed in mining them.
The inter-agency Quota Committee promulgated certain rules of which Nos. 1, 3 and 8 are as follows:
1. Quota revisions are calculated to provide the financial bases for future production only.
3. Quota revisions for forward production shall not include allowances for the reimbursement of past losses.
8. Quotas may not be made retroactive beyond the first, of the month during which the application was received, except to provide for: (a) increased payments to compensate for wage adjustments approved by the Director of Economic Stabilization in cases where past operating margins for the period covered by the Wage increase have been inadequate to absorb the increased wage costs, and (b) rectification of an error in calculation made by the Quota Committee.
The MacArthur Mining Company was formed, acquired mining properties, borrowed some money from the RFC, and began production of lead and zinc in submarginal properties early in 1943. This company is of such size that it may be properly termed a small business in the industry.
The O.P.A. determined that in general $.55 per rock ton was a fair margin of profit for the mine operators in the tri-state district where the MacArthur properties were located.[7]
Quotas and premiums were established by the Quota Committee which were designed and intended to bring MacArthur’s profit up to the fair margin of profit in 1943. They did not. There was no profit. Protests of the premiums set .were repeatedly made by the MacArthur but production continued. The protests were overruled because in the opinion of the Quota Committee an adequate margin of profit was indicated. Those rulings were protested and cost figures presented in support of the protest. At the same time the MacArthur was advised that if the premium under the revised quota was insufficient to secure an adequate margin it was sug *178 gested that MacArthur find another mine to operate— MacArthur replied that it was a new mine and hence costs had been unusually high and again protested for former premium allowances.
On December 30, 1943, the Director of the Metal Mining Analysis, O.P.A., advised MacArthur’s president that it would be well to wait until the cost and revenue situation was stabilized at full production before considering an operating report submitted in connection with maims for more favorable quotas and additional premiums.[8]
Conditions continued in this manner until the middle of the year 1944 when premiums were established which resulted in some profit. Those premiums appear to constitute a substantial vindication of the protests made of the former allowances.
R.F.C. has been partially repaid. MacArthur continues its protests of the early quota and premium allowances and requests the latter’s adjustment in order that a fair return may be realized and R.F.C. may be paid.
An examination of the file justifies the conclusion that Mr. Nelson’s letter of April 17, 1943 and the President’s approval of it constitutes a commitment to MacArthur that quotas and premiums would be established which would result in a fair margin of profit. There seems to be no substantial dispute concerning that. The dispute arises over the question whether Regulation #8, above quoted, prevents reconsideration of the quotas assigned m the past, in light of the declared national policy to pay prices bearing a reasonable relation to the costs of production and the earning of a fair return over the costs of each separate producer.
It is the opinion of the Stabilization Administrator that Regulation #8 does not and should not so operate in this case. Repeated requests for revision of the questioned quotas were made by MacArthur immediately upon their assignment. MacArthur was told, by the letter of December 30, 1943, hereinabove mentioned, that it would be well to wait until full production was achieved and costs stabilized before consideration be given to data submitted by MacArthur in support of his protests and requests for revision of quotas. This letter was an express deference of the review of operating costs with a view to further consideration in the light of actual developments. Consequently fairness and na *179 tional policy, relied upon by MacArthur, require the review of this case on its merits by the authorities charged with determining the proper assignment of quotas to MacArthur.
If upon examination, it is found that the quotas _ complained of did not, in fact, result in prices bearing a reasonable relation to the MacArthur’s reasonable costs of production and do not provide MacArthur with a fair return over its costs, a proper adjustment of the previously assigned quotas should be made. To this end data on practices and costs compiled from time to time by an agency of government, the R.F.C., are available for study.
The question of what the legal effect of the commitment is with respect to the validity of the regulation in question is probably a question for the courts to determine. The determination of the nature of that problem and the proper forum for its decision is not decisive, however, in view of the record. For even if the commitment contemplated and authorized prospective quotas only, it did not prohibit a reservation of final action on the quotas and premiums fixed prospectively. It seems that this is what occurred in this case. The operator was constantly protesting the premium allowances and at least on one occasion there was a definite deference of a review of operating costs pending stabilization of costs and revenues.
In view of the fact that the quotas and premiums fixed prior to the middle of the year 1944 can under this record now be fully considered in the light of the past stabilization of costs and substantial justice be done without committing the government to a policy of re-opening quotas definitely closed, it is respectfully suggested and recommended that the Quota Committee consider the quotas and premiums for the period prior to midyear 1944 and with the benefit of information now available covering that period finally fix such premium therefor which will be compensatory to the extent of the Executive commitment.
Very truly yours,
John C. Collet.
,41. On January 2, 1946, Landon F. Strobel, Executive Secretary of the Quota Committee “per Cornwell”, wrote the following letter in reply to the Stabilization trator’s letter of December 4, 1945:
*180 CIVILIAN PRODUCTION ADMINISTRATION,

Washington %B, D.O.,

January %,19J¡6.

The Honorable, Judge John C. Collet,
Stabilization Administrator,

Washington 'M, D.O.

My Dear Judge Collet :
He: MacArth-wr Mining Company Baxter Springs, Kansas
This is in reply to your letter of December 4, relative to premiums paid to the MacArthur Mining Company under quotas in effect during the years 1943 and 1944. You suggest that the Quota Committee reconsider the quotas which were in effect during that period, and with the benefit of information now available, set quotas retroactively for that period which will be compensatory to the extent of the Executive commitment, without (in your opinion), committing the Government to a policy of reopening quotas definitely closed.
The commitment to which you refer is found in the statement by Mr. Donald Nelson on strategic metals and minerals which was made public on April 24,1943, after approval by the President. Paragraph 5 of this statement is as follows:
5. It is national policy that labor, materials, transportation, and time to get into production, rather than money cost, are to be considered the controlling factors in deciding whether or not to increase production, but that the price paid shall bear a reasonable _ relation to the costs of production and the earning of a fair return over the costs of each separate producer.
_You consider that this language constituted a commitment to the MacArthur Mining Company that quotas and premiums would be established which would result m a fair margin of profit. The Quota Committee has, however, always put a somewhat different construction on Mr. Nelson’s statement.
The Premium Price Plan for Copper, Lead and Zinc, which provided for differential pricing on a mine by mine basis, was announced in February 1942, and became effective as of the first of that month. By the summer of that year, it had become a regular practice to adjust production quotas applicable to future production where it appeared that such production would not otherwise be possible on a reasonable financial basis. *181 In other words, it was customary to adjust by means of a quota revision the price paid for production from a particular mine to a figure which was considered to be adequate to permit future mining operations on a reasonable operating margin. In setting such a price for future production, it was fully realized because of the uncertainties involved in mining, that it would be inadequate in some cases and excessive in others.
We believe that Mr. Nelson must have had in mind this established practice when he in April 1943, made the statement set out in his paragraph 5. He was, we think, affirming publicly and giving assurance of the continuance of the basic policy of operation under the Premium Price Plan which was that qrtotas, and thereby premium prices, should be set on a mine by mine basis with a view to meeting the financial requirements of each particular operation. We do not think that Mr. Nelson’s statement went beyond the affirmation that it would be government policy to attempt to fix quotas and prices so as to cover the anticipated costs and a reasonable return for individual mines. He did not, we believe, intend to guarantee to each and every mine operator his costs plus a profit. Only one mine operator has ever suggested to the Quota Committee that Mr. Nelson so intended and that his statement had the legal effect of turning the Premium Price Plan into a guaranteed cost plus system for every mine operator. The Premium Price Plan was administered on the same principles both before and after Mr. Nelson’s statement. This seems clear evidence that Mr. Nelson’s statement was an affirmation of the existing operation of the Plan.
We consider that the Quota Committee has an obligation to recommend quotas which are calculated to afford a reasonable return. Such recommendations are based on facts which cannot be known in advance with certainty and an element of judgment necessarily enters into quota calculations. Subject to these limitations which must be present if the price of mine production is to be set before mining rather than afterwards, the Committee recommends quotas calculated to cover cash costs and amortization of war time investment and to yield reasonable margins. These margins, which have been standardized with the passage of time, cover depletion, depreciation and profit. Almost never does operation under a quota result in the realization of exactly the margin used in the calculation. Often times, the operator will earn a larger return than intended while in other cases his margin will be less and in still others, he may sustain a cash loss.
*182 Where the return under a quota is much above what appears to be adequate, the Committee recommends an adjustment of quota to lower the subsidy paid the operator. Such adjustment is prospective only and there is no renegotiation of the price paid under the former quota. Likewise, the new quota is calculated to yield the full standard margin.
If a quota yields an inadequate as opposed to an excessive return, the Committee, on application, considers the need of a more favorable quota and makes such recommendation if it appears to be warranted. Except in cases involving errors in former calculations or approved retroactive wage increases, such revisions are, as in the case of mines receiving excessive returns, for prospective operation only. However, in order that no applicant will be prejudiced by necessary administrative delay in the calculation and issuance of a revised quota, favorable revisions are, where the facts warrant, made effective as of the first of the month during which the application for revision was received.
It would seem that if it had been intended that no operation should receive less than costs plus the standard margin, all quotas should have been calculated after the event by accountants rather than before production by mining engineers. To figure all quotas prospectively and then to recalculate only those where the margin earned has been less than intended would be even more unsatisfactory than a straight cost-plus system. Yet, we believe that to recalculate the MacArthur quota for the reasons you_ propose would be to put such a system into effect. This is so because many other mines operating under the Premium Price Plan have, as in the case of the MacArthur, earned less than the standard margin and, unfortunately, some have sustained an out of pocket loss.
By the above statement, we do not mean to indicate that mine operations under the Premium Price Plan have not been generally satisfactory. We think that they have. Data on a large number of companies indicate that margins as a whole have been generally fair and equitable. The Premium Price Plan has been so administered as to make possible, without general price increases, the satisfactory operation of the great majority of all copper, lead and zinc mines despite the enormous disparity of costs as between different mines. The Quota Committee believes that in accomplishing this result, it has achieved the goal stated by Mr. Nelson.
*183 As your suggestion that the Quota Committee consider retroactive revision of the MacArthur quotas appears to turn upon Mr. Nelson’s statement, we have gone into considerable detail as to our understanding of that statement, and our operations under the Premium Price Plan. In the. hope that you will consider this a sufficient explanation of our position and decision as to the case in question, we refrain from going into details as to the facts of the MacArthur case. Should you, however, desire we shall, of course, be glad to go into the facts and to make our files available to any member of your staff whom you might designate.
Yours very truly,
(Signed) LaNDON F. Sxeobel,
Per CORNWELL.
LaNDON F. Steobee,
Executive Secretary, Quota Committee, Premium Price Plan for Coffer, Lead and Zinc, Social Security Building — Room J¡317.
42. On January 9, 1946, Judge Collet wrote the Quota Committee, as follows :
Your letter of January 2 replying to my letter of December 4 is at hand. I have carefully considered your letter of January 2 and adhere to the views which I expressed in my letter of December 4. I do not know what would be the result of a reexamination of the quotas assigned in the MacArthur Mining Company, Inc., but I do consider that fairness on the part of the government requires a reexamination in order to correct any injustices that may have been done.
If the Quota Committee has any additional arguments to make against the reconsideration of the quotas assigned in the MacArthur Mining Co., Inc., case I would be glad to have them in writing as soon as possible. Upon receipt of any such written arguments, if an examination of the facts and of your files appears to be indicated, I will make arrangements for a hearing at which time the Quota Committee and MacArthur Mining Co., Inc., may be represented.
43. On January 24, 1946, Judge Collet sent the following letter to the Quota Committee:
On December 4, I addressed to you an opinion concerning the right of MacArthur Mining Company, Inc., Baxter Springs, Kansas, to reconsideration of quotas assigned it by your Committee in 1943 and 1944.
*184 Since that time, I have received two letters from Mr. Landon. F. Strobel, Executive Secretary of the Committee, dated January 2 and January 22 respectively.[9] Neither of these letters has changed my opinion about the propriety of the reasoning or action contained in my letter of December 4,1945.
I do not intend to enter into a prolonged correspondence with your Executive Secretary. Therefore, I am inviting the Committee to submit in writing, as soon as possible, in one document, all arguments and statements of facts bearing on the propriety of the opinion contained in my letter of December 4. If the matter then appears to require a further hearing by me, I will arrange such a hearing in the presence of all interested parties.
44. On March 28, 1946, Chester Bowles, Judge Collet’s successor as Stabilization Administrator,[10] wrote the following letter to Mr. Hoffman of MacArthur:
While Judge Collett was Stabilization Administrator, he wrote to the Quota Committee asking that the case of the MacArthur Mining Company, Incorporated, be reexamined with a view to determining what action should be taken on your application for a retroactive revision of the quota.
I have now received a report from the Quota Committee outlining the result of the reexamination of your case which was undertaken pursuant to Judge Collet’s request. It is evident that tte- Quota Committee has fully and carefully reviewed the matter, and its findings have been exhaustively disclose ’ with members of my staff.
On the basis of this review of the facts, I am satisfied that no basis exists for a retroactive revision of the quota of the MacArthur Mining Company, and that no exception should be made in this case to the Quota Committee’s well-established rule against retroactive quota revisions.
I have therefore notified the Committee that this Office considers the matter closed.
45. In July 1947, there was further re-examination of MacArthur’s request for retroactive revision of its 1943 and 1944 quotas. In this connection, an interdepartmental memorandum dated July 11,1947, to the Solicitor of the Depart *185 ment of Commerce from the Department’s Director, Office of Premium Price Plan, Division of Liquidation, stated in part:
The re-examination of (the MacArthur) case made on July 9, 1947 substantiates our former position that no retroactive revision is justified in this case. You will note that the summary on page one demonstrates that for the years 1948 and 1944 actual margins were in excess of table margins. Table margins are those calculated in accordance with standards which apply throughout the Tri-State area. It is likewise noteworthy that from December 1,1944 to June 1,1947, with the exception of the month of October 1946, this operator has been assigned maximum premiums under the Premium Price Plan. For the year 1945 actual margins were substantially in excess of table margins, and for the first 9 months of 1946 were greatly in excess thereof. On October 1,1946 the operator’s maximum assignment was reduced, since our records showed that excess margins had been earned after full allowance for table margin and amortization of capital investments. Under the reduced quota for the month of October 1946 the operator still exceeded table margin by 2 cents per ton ox ore mined. As a result of the operator’s request, based on the new forecast and additional capital expenditures, the maximum premiums were reinstated for this mine on November 1,1946. Since that date the operator has earned less than table margin. This has been due primarily to a'reduction in the grade of ore mined and to increases in bperating costs. Since for all practical purposes the mine has been assigned maximum premiums under the Plan since December 1, 1944, no further relief for the losses incurred during the past 6 months is possible.
Mr. Hoffman’s claim apparently pertains to operations during the years 1943 and 1944, during a part of which period he did not have maximum premiums. The record clearly demonstrates that even on the quotas assigned, excess margins were made.
The following facts appear to be conclusive:
(1) The MacArthur Mine from January 1, 1943 to October 1,1946 under quotas assigned by the Quota Committee, earned a net profit of $227,353, amortized its capital _ expenditures of $151,000 completely, and received in addition thereto $7,159 in excess margins.
*186 (2) From November 1, 1946 to June 1,1947 the MacArthur Mine made a net profit of $15,525. Although this figure is short of the table margin and the capital expenditures reported subsequent to October 1,1946, the mine was operating under maximum allowable premiums, so that no quota revision for that period is possible.
It is a well established rule of the Premium Price Plan that no retroactive quota revisions may be made in order to restore past losses or recapture past excess earnings. Our examination indicates that no losses were suffered by this company during the period in which less than maximum quotas were assigned. Even though losses had been incurred by the operator, the above stated rule of the Premium Price Plan would have precluded retroactive quota revision in order to repair such losses.
For the foregoing reasons, we recommend that the request of the MacArthur Mining Company for retroactive quota revision be denied.
46. (a) Section 203(a) of the Emergency Price Control Act of 1942 (50 U.S.C. App. § 923(a)) provided in part:
At any time after the issuance of any regulation or order under section 2, * * * any person subject to any provision of such regulation, order, or price schedule may, in accordance with regulations to be prescribed by the Administrator, file a protest specifically setting forth objections to any such provision and affidavits or other written evidence in support of such objections. * * * Within a reasonable time after the filing of any protest under this subsection, but in no event more than thirty days after such filing, the Administrator shall either grant or deny such protest in whole or in part, notice such protest for hearing, or provide an opportunity to present further evidence in connection therewith. In the event that the Administrator denies any such protest in whole or in part, he shall inform the protestant of the grounds upon which such decision is based, and of any economic data and other facts of which the Administrator has taken official notice.
(b) Section 204(a) of the Emergency Price Control Act of 1942 (50 U.S.C. App. § 924(a)) provided in part;
Any person who is aggrieved by the denial or partial denial of his protest may, within thirty days after such denial, file a complaint with the Emergency Court of *187 Appeals, * * * specifying his objections and praying that the regulation, order, or price schedule protested be enjoined or set aside in whole or in part. * * * Upon the filing of such complaint the court shall have exclusive jurisdiction to set aside such regulation, order, or price schedule, in whole or in part, to dismiss the complaint, or to remand the proceedmg: Provided, That the regulation, order, or price schedule may be modified or rescinded by the Administrator at any time notwithstanding the pendency of such complaint. * * *
(c) The record does not disclose whether MacArthur’s “protests” complied with the procedures specified by the Emergency Price Control Act of 1942. There is no showing in the record that MacArthur filed a complaint in the Emergency Court of Appeals.
47. On January 28,1948, MacArthur filed suit against the RFC in the United States District Court for the Western District of Missouri for losses allegedly incurred in 1943 and 1944, together with a fair margin of profit. After denying the defendant’s motion to dismiss for lack of jurisdiction,[11] the court held that the April 17,1943 letter of the Chairman of the War Production Board and the President’s letter of April 24, 1943 were “a commitment by the Government to vouchsafe to the plaintiff a recoupment of losses and a fair margin of profit.” It held that with such assurances MacArthur undertook the operation of its marginal mine, that the “contract was recognized by the Government and fully carried out by the plaintiff”, and that the “Government * * * (was) in default because it had not made good its promise to save the plaintiff from loss and to assure it a fair margin of profit.” MacArthur Mining Co. v. Reconstruction Finance Corp., 87 F. Supp. 211 (1949).
The court found that because of inadequate quotas for the years 1943 and 1944, MacArthur incurred a net loss in that period of $17,845.52, and also that a fair and reasonable margin of profit for such two years would have been $278,836.25. Accordingly, judgment was entered for Mac *188 Arthur in the amount of $296,681.77 — the amount of the claim in the present case.
48. The United States Court of Appeals for the Eighth Circuit reversed the judgment of the trial court. Reconstruction Finance Corp. v. MacArthur Mining Co., 184 F. 2d 913 (1950); reh. den. Dec. 5, 1950; cert. den. 340 U.S. 943; reh. den. 341 U.S. 917; motion for leave to file writ of prohibition den. 342 U.S. 807. The court held that the district court lacked jurisdiction for two reasons: first, because the Emergency Court of Appeals had exclusive jurisdiction of the subject matter of the action; and second, because the suit was in fact one against the United States in which the plaintiff sought more than $10,000.
The court held too that the Nelson letter of April 17,1943, and the presidential letter of April 24, 1943, contained “no promise on the part of the government to do anything — they declare a policy only;” that “the rights of plaintiff must be found in the applicable statutes, the regulations, and the executive orders made thereunder”; and that “plaintiff claims no contractual rights under the statutes or regulations.” 3h this connection, the court added (p. 916):
A government “policy” does not give rise to a contract in and of itself. The announced policy does no more than to authorize the appropriate government agency to enter into a contract consistent with the policy, and in entering into a contract thus permitted the agency is bound to observe and comply with the provisions of the statutes and regulations applicable. In this instance it must be observed that the contract or arrangement under which plaintiff claimed “premiums” was entered into prior to January 1,1943, and the presidential letter was not written until April 24,1943.
PLAINTIFF’S CLAIM NOR $17,845.52 FOR ALLEGED LOSSES IN 1943 AND 1944
49. (a) MacArthur claims $17,845.52 as an alleged loss for the years 1943 and 1944.[12] This is apparently predicated *189 on a net loss of 10 Vz cents per rock ton mined by the company during those two years.[13]
(b) The record establishes that for 1943 and 1944 MacArthur had an aggregate net profit of $52,955.18 (without considering depletion) and an aggregate net profit of $7,002.19 (considering depletion). See findings 28, 29(c), and 31(b).
(c) The record further establishes that for 1943 and 1944 MacArthur had an aggregate net profit, before depletion, of $0,237 per rock ton, and an aggregate net profit of $0,031 per rock ton taking depletion into account. See findings 28, 29(c) and 31(b).
PLAINTIKir’s CLAIM FOR $278,836.25 POR LOSS OP PROPITS IN 1943 AND 1944
00. MacArthur claims $278,836.25 as a reasonable margin of profit for the years 1943 and 1944.[14] This figure is based on a profit of $1.25 per rock ton for the 223,069 tons the company mined during the two years in question.
51. In support of the $1.25 figure per rock ton, MacArthur presented nine witnesses who estimated that such an amount, more or less, represented a fair margin of profit. See finding 52. Defendant produced no witnesses pertaining to the question of what would constitute a fair margin of profit to MacArthur in the premises.
52. (a) Plaintiff’s witness A. G. Johnson testified that he had been actively engaged in mine prospecting in the TriState area from 1913 to 1937; that he had represented a company that had leased the mine in question from 1916 to 1936; and that in 1927, an operating profit of 70 cents per ton was inadequate to operate the mine profitably.
(b) Plaintiff’s witness W. L. Kepner testified that he was a mining engineer who had been a supervising engineer with the RFC from 1942 to 1946; that from about 1907 to 1949, the major part of his time had been spent in mining in the Tri-State area; and that from the years 1943 on, if he were “evaluating the property for the RFC, (he) would want to *190 show an estimated rock ton profit of from $2.00 to $4.00 a ton.”
(c) Plaintiff’s witness William M. Stewart testified that he was a mining and civil engineer with 40 years of experience in the Tri-State area; that at the request of Mac-Arthnr’s president, Mr. Hoffman, he had, as of January 1, 1943, made a study of MacArthur’s operations (see finding 37) ; and that in his opinion a fair margin of profit would be $1.30 per rock ton as of January 1,1943.
(d) Plaintiff’s witness Gruy H. Warring testified that he had 50 years of mining experience in the Tri-State area; and that from his experience in the area, $1.00 a rock ton would, in his judgment, be a fair margin of profit for a mine of this type.
(e) Mr. Hoffman, president of MacArthur, testified that in his judgment a fair margin of profit would be “something * * * between $1.00 and $1.50 a rock ton”.
(f) Plaintiff’s witness Simeon Clarke testified that he had been a mining engineer with some 55 years of experience, of which about 38 years had been in lead and zinc mining in the Tri-State area; that he had been superintendent of various mines in the area, not including the MacArthur mine; that from 1943 to 1946, he had viewed the MacArthur mine operations underground on about six occasions; and that in his opinion “it would require $1.25 to $1.75 a * * * rock ton to have a profitable venture. * * *”
Mr. Clarke testified on cross-examination that he was not familiar with the costs of the smaller producers; that he was not familiar with difficulties encountered by MacArthur in 1943 and 1944; and that he did not know the number of miners it employed during those two years.
(g) Plaintiff’s witness Frank Fénix testified that he had been in the mining business for about 50 years, principally in lead and zinc mining in private and State positions of great responsibility; that he knew the MacArthur mine by reputation; that he had been by the mine a number of times; that though he never had been underground in the mine, he was familiar with “the location and the formation and the district in general”; that the mining business “is possibly the biggest gamble that a man can take”; and that a *191 fair return for the average mine would be somewhere between $1.25 and $1.40 a ton.
On cross-examination Mr. Fénix testified that profits depend on efficiency; that as a rule, costs are greater in the first year of operation than later on; and that in many cases there are no profits the first year “because it sometimes takes that long to develop and open up amine. * * *”
(h) Plaintiff’s witness Clem F. Denny testified that he had been in the mining business in the Tri-State area from 1929 to 1945; that after MacArthur started operations at the mine site, he had visited the installation above ground; and that in his opinion, in 1948 and 1944, a fair return for a mine of the type of MacArthur would be from $1.45 to $1.50 per ton.
On cross-examination Mr. Denny testified that to realize a fair return, a mine had to be operated efficiently; that a number of factors affected the rate of return, such as labor and material expenses; that expenses are higher in the first year or two of operation; and that in the first year of operation, maximum profits could not be expected.
(i) Plaintiff’s witness P. E. Tabor testified that he was a lifelong resident of the Tri-State area, with about 40 years of experience in lead and zinc mining in the area; that to “keep posted” on conditions in the area he went underground in the MacArthur mine about six or seven times; that his visual examination indicated that the operation was an efficient one; and that in his opinion a mine like the MacArthur one should have a profit of $2.00 per ton.
Mr. Tabor testfied on cross-examination that he had no idea as to MacArthur’s operating costs or as to typical operating costs in the Tri-State area; and that he did not know how much MacArthur had invested in the mine or what its estimated ore reserves were.
53. The average minimum margin of profit estimated by plaintiff’s nine witnesses is $1.33 per rock ton; the average maximum profit, $1.81.
,54. Plaintiff’s witness who presented estimates as to a fair margin of profit were, with the exception of Mr. Hoffman, the company’ president, not familiar with MacArthur’s efficiency or lack of efficiency in operating the mine, or with *192 problems encountered by the company in 1943 and 1944 which resulted in increased costs. See findings 59-65. These witnesses did not take into account the high risk and various contingencies affecting mining costs and profits, or the high costs incident to the early stage of mining operations. None of plaintiff’s witnesses testified as to the factors he took into consideration in reaching his opinion.
a. Efficiency of MacArthur s operations at various times in 191$ amd 191$ as reported by BFO
55. On March 15, 1943, the EFC wrote to MacArthur in part as follows:
Frankly, the reports and figures submitted are vague and inconclusive and appear worthless as a guide upon which to base corrective criticism. As an example, you have listed for the month of January a total expense of $5.34 a ton for mining and milling. We do not believe this compares favorably with the average figures for the district, which, as we understand it, do not exceed $2.50 a ton at this time.
* # * %
In any event, we are certain that a mining and milling cost of $5.34 for your district is entirely out of line and corrective steps should be taken at once to put the operation on a more efficient basis.
56. On April 20,1943, the EFC wrote MacArthur in part:
It appears to us that the miscellaneous operating expenses are unduly high and that the actual underground expenses also are out of proportion to the rock hoisted. Based on the figures you have submitted it appears that if your tonnage doubled, based on the February performance, your operating costs would exceed $4.43 a ton, a figure we all know is out of line for the district.
If your property is to continue producing zinc, it is apparent that the strictest economy must be effected on the surface and an increase in efficiency must be obtained in your mining.
57. On August 2, 1943, the EFC wrote to MacArthur in part:
When you were in Washington, you said your April operation was a normal operating period and you explained that the loss sustained in May was unusual in *193 many respects. We were given to understand that June operations should be compared with the April operations.
It appears that your over-all cost (exclusive of interest or loan repayment) for the month of April was $3,817 a ton, while your June costs were $4,894 a ton. The grade of ore in April was 4.79 recoverable sulfide, while the June grade was 3.35 recoverable sulfide.
It appears to us that with your grade down and your costs at least a dollar more than previous comparable month, even with a “C” quota you will not be able to sustain a mining operation at your property. We believe it appropriate that a concerted effort be made to conduct your operation on a more efficient basis. Our Supervising Engineer will be pleased to make specific recommendations regarding the cutting of costs in your mine.
58. On March 8, 1944, the RFC wrote MacArthur:
On February 28,1944, our Supervising Engineer, Mr. Ellis, made an inspection trip through your mine. His report indicates that a more efficient operation could be conducted if greater attention were paid to the actual details of mining.
Insofar as about one half of your ore body has been mined and no payments have been made either on the principal or interest on the loan, we believe immediate steps should be taken in order that your mining cost can be brought more in line with the average cost obtained by other large producers in the field.
I believe a frank discussion with Mr. Ellis will result in a better understanding on your part of some of the-reasons why your operation continues to be a high cost producer. _ Such a discussion should result in taking steps to bring your mine cost into line. Please arrange for such a conference in the near future.
b. Difficulties MacArthur experienced in operating mine in 191$ and 191$
59. On April 28, 1943, MacArthur reported to the RFC' that is was experiencing a great deal of difficulty with the water; that its pump was inadequate; and that several days-were lost that week as a result.
60. On May 19, 1943, MacArthur advised the RFC that-“there has been considerable lost time on account of water-in mine”; and that its “pump for the past six weeks has beert *194 inadequate and unable to handle the water, * * *” The company further reported that a new pump had finally arrived which “handles the water fine.” On June 12, 1943, MacArthur reported that in the previous month it had lost almost two weeks’ operating time because it “could not control the water underground and finally installed another * * * pump.” It also reported that as soon as the new pump was put into operation, floods occurred in the entire district causing a curtailment of electric power to all mines in the area and closing down all MacArthur’s operations. The company further advised the NFC that it had received from the Quota Committee a bonus in the form of a C-25 quota “which will allow us to operate and accumulate sufficient reserves to take care of not only the payments due (RFC), but also permit us to complete our south shaft.”
61. Due to these difficulties, MacArthur’s output fell from 5,830 rock tons in April 1943 to 3,879 tons in the next month.
62. During 1943 and most of 1944, no portion of the MacArthur mine was mechanized. In the latter part of 1944, the company installed two overhead loaders, but reported that it “didn’t get any of the real modem equipment * * * until * * * the latter part of 1945 or (19)46”. The lack of mechanization in 1943 and 1944 increased MacArthur’s costs materially since it is more economical to operate a mechanized property than one which is not.
63. In January; and February 1944, MacArthur advised the Quota Committee that it did not secure the tonnage it had expected due to cold weather and icing conditions, and also because of the illness of its president. It reported that “(a) 11 development costs have been charged into the Operating account and that of course is part of the reason for higher costs than anticipated.”
64. In the last ten days of July 1944, MacArthur’s operations were delayed and costs increased by reason of bad ventilation in the mine.
65. In the early part of December 1944, MacArthur’s south hopper and derrick, together with contents, including one of its large pumps, were destroyed by fire. The company notified the Quota Committee that this would curtail its tonnage production in that month about 25% or 35%.
*195 66. (a) As in all mining ventures, the first year of operation, in this case 1943, normally calls for high costs because production at the outset is small and increases gradually. Correspondingly, costs at first are high per unit and tend to reduce as unit production increases.
(b) Tin-ring 1943, MacArthur’s production gradually increased from 1,902 tons in January to 10,065 tons in November. During 1944, the second year of production, the output was greater. For example, in May 1943 its output was 3,879 tons, while in May 1944 its output was 13,480 tons.
plaintiff’s indebtedness to dependant
67. In this action the defendant counterclaimed for $83,108.26, the amount allegedly owed by MacArthur to the United States.
68. (a) The parties have stipulated that plaintiff owed the Internal Revenue Service $22,664.02, of which $9,086.93 has been paid, leaving a net amount of $13,577.09 due the Internal Revenue Service.
(b) The parties have also stipulated that plaintiff is indebted to the General Services Administration in the amount of $50,444.26, representing a loan of $45,000, plus interest and costs, made subsequent to 1947 by the Defense Materials Procurement Agency to enable MacArthur to re-engage in active mining for the purpose of development of additional capacity for the mining of lead and zinc ores in the interests of national defense.
(c) There is thus no dispute that plaintiff is indebted to the defendant in the total amount of $64,021.35.
ultimate pindings
69. Plaintiff has failed to demonstrate that the quotas assigned to it under the Premium Price Plan were unfair or unreasonable or were the result of arbitrary or capricious action on the part of the Quota Committee.
¡70. There is no evidence that plaintiff failed to receive all the premiums to which it was entitled on the basis of the quotas assigned to it under the Premium Price Plan.
71. There is no evidence to show that the Premium Price Plan provided any guarantee of profits or any guarantee against loss.
*196 72. The record establishes that under the rules of the Quota Committee, quotas could not be made retroactive beyond the first of the month during which the application was received, except to provide for:
(a) Increased payments to compensate for wage adjustments approved by the Director of Economic Stabilization in cases where past operating margins for the period covered by the wage increase were inadequate to absorb the increased costs, or
(b) Rectification of an error in calculation made by the Quota Committee.
73. (a) Plaintiff has produced no evidence to show that, apart from the two foregoing exceptions, the Quota Committee ever revised a quota retroactively beyond the first of the month during which the application was received to make up a company’s losses.
(b) Plaintiff has produced no evidence to show that the Quota Committee ever revised a quota retroactively to recapture excess profits.
74. Plaintiff has produced no evidence to show that it sought or was entitled to a retroactive revision of its 1943 and 1944 quotas by reason of increased payments to compensate for wage adjustments approved by the Director of Economic Stabilization or because of an error in calculation made by the Quota Committee.
75. The record establishes that under the Premium Price Plan quotas were based on future anticipated production and not on past production.
76. The record shows that in the period from January 1, 1943 to December 31, 1944, plaintiff did not suffer a net loss but earned an aggregate net profit of $52,955.18 not taking depletion into account. The record further shows that taking depletion into account, plaintiff earned in those two years an aggregate net profit of $7,002.19.
77. The records shows that in the years from 1943 to 1947, inclusive, during which it participated in the Premium Price Plan, plaintiff earned a net profit of $279,760.83, not taking depletion into account. The record also shows that taking depletion into account, plaintiff’s net profit in this period was $203,164.94.

 Trial Commissioner Herbert N. Maletz, at tbe direction of the court, prepared recommended ultimate findings in this case, which were of substantial .assistance.
Since the case was referred, the petition filed, and the hearings held prior to •the decision of the Supreme Court in Glidden v. Zdanok, 370 U.S. 530 (1982), we think it proper to file this report without reference to the Supreme Court’s ■opinions in that case.

 See letter of Sept. 7, 1945 written to Senator Capper by Harold Judson, Assistant Solicitor General. The letter is set forth in Finding 12.

 On March 26, 1957, a prior Congressional reference petition was filed in this court by MacArthur Mining Company, Inc., against the united States (Cong. No. 2-57) pursuant to H. Res. 174, S5th Cong., 1st Sess., accompanied by H. Kept. No. 158, 85th Cong., 1st Sess., and H.R. 2648, 85th Cong., 1st Sess., entitled “A bill for the relief of the MacArthur Mining Company, Incorporated, in receivership.” Later in that session, the House of Representatives adopted H. Res. 241 (85th Cong., 1st Sess.) rescinding its prior action adopting H. Res. 174 and directing tills court to return to the House the bill (H.R. 2648), together with all accompanying papers referred to the court by H. Res. 174. Pursuant to this directive, the bill and all accompanying papers were returned to the House by the court on May 9, 1957.

 The Metals Reserve Company was created pursuant to Section 5d(3) of the RFC Act, as amended, on June 28, 1940. Its principal functions were (a) the procurement, stockpiling and disposal of metals and minerals defined as strategic and critical materials by the President; and (b) the payment of subsidies to producers of strategic and critical materials. Such subsidies were paid under the authority of Section 2(e) of the Emergency Price Control Act of 1942 (50 U.S.C. App. § 902(e)). MRC was dissolved effective July 1, 1945, and its functions were transferred to the RFC.

 Tie Quota Committee had developed a table of margins applicable to all mines in tie Tri-State area. Tie tatle was used to determine tie margin for any mine located in tiat area. See also findings 23 (pars. 13, 14, 15) and 24.

 In computing net operating income and net income, tiere were deducted royalty payments made by MacArtbur to tie owner of the mine. These figures for net operating income and net income do not take depletion into account.

 There is no evidence in the record — the Stabilization Administrator’s statement to the contrary notwithstanding — that OPA, the Quota Committee, or any other Federal agency ever had made a determination that $0.55 a rock ton (or any other amount) was in general a fair margin of profit for mine operators in the Tri-State area.

 See finding 38(b).

 Mr. Strobel’s letter of January 22, 1946 Is not contained In the record.

 Mr. Bowles’ title was Director of Economic Stabilization.

 MacArthur Mining Co. v. Reconstruction Finance Corp., 82 F. Supp. 455 (1949). The defendant contended in its motion to dismiss that the action was in substance against the united States which had not waived its immunity from suit; that the United States was an indispensable party; that plaintiff had not exhausted its administrative remedy; and that the action was exclusively within the jurisdiction of the Emergency Court of Appeals.

 The District Court found that in 1943 and 1944 MacArthur suffered a net loss in this amount. See finding 47.

 In those two years MacArthur mined 223,069 tons. See finding 30. At 10% cents per ton, the alleged net loss would be $23,422.25 rather than $17,845.52.

 This was the amount the District Court had found MacArthur was entitled to as a fair and reasonable profit for these two years. See finding 47.